[No. 708.]

## S. HEYDENFELDT, Appellant, v. THE DANEY GOLD AND SILVER MINING COMPANY, Respondent.

Sixteenth and Thirty-sixth Sections—Enabling Act of Congress.—Assuming that the proper construction of section seven of the enabling act of Congress (13 U. S. Stat. 32; Stat. of Nev. 1864-5, 37) is, that the grant of the sixteenth and thirty-sixth sections took effect absolutely upon the admission of this State into the Union, and that the title to said lands then vested in this State: *Held*, that Congress could thereafter, with the consent of this State, prior to the disposal by the State of any of the lands embraced in said sections, and at any time prior to the survey, change the terms of the grant.

Idem—Construction of Act of Congress and Statute of Nevada.—In construing the act of Congress, approved July 4, 1866 (14 U. S. Stat.

85-6, Sec. 5), and the act of this State, approved February 13, 1867 (Stat. of Nev. 1867, 57): *Held,* that this State, in accepting the grant, unequivocally consented to the reservation by Congress of the mineral lands, and accepted the grant with all the conditions and reservations contained in said act of Congress.

IDEM—MINERAL LANDS.—If it be conceded that the State had a vested title to the mineral lands contained in the sixteenth and thirty-sixth sections, prior to the act of February 13, 1867: *Held,* that by the provisions of said act it relinquished its right thereto, and thereby agreed to accept other lands in lieu thereof; that the passage of said act was a recognition by the legislature of this State of the validity of the claim made by the government of the United States to the mineral lands.  (*Beatty, J., dissenting.*)

IDEM—PATENT ISSUED BY STATE CONVEYS NO TITLE TO MINERAL LANDS.—Where plaintiff claims title under a patent issued by the State under and by virtue of the statute authorizing the conveyance of lands granted by the enabling act of Congress: *Held,* that the title of the State to the land so conveyed was, at the time of the survey thereof, subject to the terms and conditions imposed by the act of Congress of July 4, 1866; and as said land was then rich in minerals, and was in possession of defendant for mining purposes, the plaintiff acquired no title thereto by virtue of the patent.

IDEM—ACT OF CONGRESS JULY 4, 1866.—The act of Congress of July 4, 1866 (Sec. 5, 14 U. S. Stat. 85-6), applies to all grants made by Congress to this State where the lands granted had not been surveyed by the government of the United States, and includes the grant mentioned in the enabling act.

IDEM—PUBLIC LANDS.—The word " public," as used in said act of Congress, is applied to all the unsurveyed lands, whether the same had been previously granted or not, and is used to distinguish the unsurveyed from the surveyed and segregated lands, where the rights of private proprietorship has attached.

IDEM—SECTION 3, ARTICLE XI, OF THE CONSTITUTION.—In construing section three, Article XI, of the Constitution: *Held,* that its object was to prevent the legislature from passing any law that would appropriate the proceeds received by the State from the sale of the sixteenth and thirty-sixth sections to any other than educational purposes.

IDEM—ACT OF FEBRUARY 13, CONSTITUTIONAL. — The act of February 13, 1867, is not in violation of the above section of the Constitution; there is nothing in the act which attempts to make any disposition of the sixteenth and thirty-sixth sections for any other than educational purposes. (*Beatty, J., dissenting.*)

APPEAL from the District Court of the First Judicial District, Storey County.

The facts are sufficiently stated in the opinion.

*Lewis & Deal*, for Appellant.

I. The land in question, being part of the sixteenth section, was granted to the State of Nevada by section seven of the enabling act of 1864. The patent issued by the State makes a *prima facie* case for the plaintiff. It cannot be denied that if the grant be a present grant, in the proper and legal signification of the word present, the land then passed to the State by the act granting it, and at the time it became a law.

It becomes necessary, therefore, to inquire whether the grant was absolute and *in præsenti*, or whether it was contingent—only to take effect in case the land should not, at the time of survey, have been sold or otherwise disposed of by act of Congress.

We claim: First. That the grant to the State is in the *nature* of a contract, and should, therefore, be construed as are ordinary contracts or instruments between individuals. Second. That it should be liberally construed in favor of the grantee; if not, that it should, at any rate, be construed as an ordinary act of Congress. Third. That the language employed is of a present grant, and is in nowise ambiguous.

II. That the grant to the State is in the *nature* of a contract there can be little, if any, controversy. It is so held to be, and we know of no authorities to the contrary. (3 Parsons on Contracts, 527; *Fletcher* v. *Peck*, 6 Cranch, 137; 18 Cal. 613.)

III. The grant being one for the public good, made by the grace of the Federal government, without solicitation by the State, and being an act of Congress, and not merely of the executive, it should be liberally construed in favor of the grantee. (*Hyman* v. *Reed*, 13 Cal. 444; 3 Washb. on Real Property, top page 172, marginal page 525, 3d ed.)

IV. The words of this grant are unequivocally words of present grant. "Are hereby granted" can admit of no other construction than that the grant is made and consummated by the act. Is it not a self-evident proposition that the act in question divested the general government of all its title to the land designated in the grant?

In construing similar language employed in a congressional grant to the State of Wisconsin, the Supreme Court of the United States, in *Schulenberg* v. *Harriman* (21 Wall. 44), say: "That the act of Congress of June 3, 1856, passed a present interest in the lands designated, there can be no doubt. The language used imports a present grant and admits of no other meaning. The language of the first section is, 'That there be and is hereby granted to the State of Wisconsin,' the lands specified. The third section declares 'that the said lands *hereby granted* to said State shall be subject to the disposal of the legislature thereof.' And the fourth section provides in what manner sales shall be made, and enacts that 'if the road be not completed within ten years, no further sales shall be made, and the lands unsold shall revert to the United States.' The power of disposal and the provision for the lands reverting both imply what the first section in terms declares, that the grant is made, that is, that the title is transferred, to the State. It is true that the route of the railroad, for the construction of which the grant was made, was yet to be designated, and until such designation the title did not attach to any *specific tracts of land.* The title passed to the sections to be afterwards located; when the route was fixed their location became certain, and the title which was previously imperfect acquired precision and became attached to the land."

It will be seen from this language of the Supreme Court that no doubt seemed to be entertained that the grant in that case, so far as the United States was concerned, was a present grant; that the title passed out of the government notwithstanding the land granted was not at the time designated, consequently it could not afterwards grant or sell the same land to another.

But the following language still more clearly shows the views entertained by the court on this question. Judge Field, who delivered the opinion, after reviewing several cases, goes on to say: "Numerous other decisions might be cited to the same purport. They establish the conclusion that unless there are other clauses in a statute restraining

the operation of words of present grant, these must be taken in their natural sense to import an immediate transfer of title, although subsequent proceedings may be required to give precision to that title and attach it to specific tracts. No individual can call in question the validity of the proceedings by which precision is thus given to the title when the United States are satisfied with them.

"The rules applicable to private transactions, which regard grants of future application—of lands to be afterwards designated—as mere contracts to convey, and not as actual conveyances, are founded upon the common law, which requires the possibility of present identification of the property to the validity of its transfer. A legislative grant operates as a law as well as a transfer of the property, and has such force as the intent of the legislature requires."

This language of the court clearly shows that it was of the opinion that a legislative grant may completely transfer the title, may be a grant *in præsenti*, although the land granted may not be identified, otherwise why should the court say that there is a distinction between the common law, in this respect, and a grant by the legislature? Suppose, after the grant to this State, Congress had passed another act granting the sixteenth and thirty-sixth sections by name to another party, would any court hesitate in holding that such second grant was absolutely void on its face? It seems to us not; and if so, does it not prove that it could not by any other act, or in any other manner, interfere with the title which it had granted to the State?

Again, in the case of *Langdeau* v. *Hanes* (21 Wall. 521), the same court says:

"If the claim be to land with defined boundaries, or capable of identification, the legislative confirmation perfects the title to the particular tract, and a subsequent patent is only documentary evidence of that title. If the claim be to quantity, and not to a specific tract capable of identification, a segregation by survey will be required, and the confirmation will then immediately attach the title to the land segregated."

Here is certainly authority, if any be necessary, to sustain the proposition attempted to be established ·by us. It is true that in the act involved in the case of *Schulenberg* v. *Harriman*, there were provisions which are not contained in our law, but it will be observed the weight of the opinion rests upon language precisely like that in the grant to the State of Nevada; and the court says of the other provisions that they only *imply* what the words like those in our grant *in terms declare.* And nothing is more obvious than that the court in that case did not consider the fact that the land granted had not been surveyed or identified, as of any consequence, but based its conclusion almost entirely upon the words of present grant, similar to those in the act under which we claim.

And again, the words, "when such sections *have been* sold or otherwise disposed of, other lands shall be taken in lieu," strengthen the conclusion that Congress intended a present grant, and not a grant of such land as might at some future time be found not to have been "sold or otherwise disposed of."

If it were intended that the grant should only carry such land as might be entirely undisposed of at some future time, it is only fair to say that the correct tense to convey that intention would have been used. In that case it should have used the future-perfect, and the sentence quoted should read, "When such sections *shall have been* sold or otherwise disposed ·of," instead of "have been," etc. The present-perfect "have been," as used in this grant, certainly indicates an act completed at the time the grant was made.

So far as sections sixteen and thirty-six are concerned, the grant is unequivocally *in præsenti;* as to lands taken in lieu of said sections the grant could not, perhaps, by the very language of the grant itself, be a present grant, because they were afterwards to be selected by the State; and the lands to be selected were, of course, uncertain both in respect to quantity and location.

But it is claimed by counsel for respondent that the construction put upon the grant by us would render the sen-

tence, "When such sections have been sold or otherwise disposed of by act of Congress, other lands shall be taken in lieu thereof," utterly nugatory and superfluous, because it is said, at the time of the grant, no land had been sold or otherwise disposed of in this State.

The most conclusive answer to the position taken by counsel on this point is, that it was not shown on the trial that no lands had been sold or otherwise disposed of in this State, and surely the burden of making such showing was upon the defendant, as it relies upon such fact for the purpose of giving construction to the grant under which the plaintiff claims. The language of the grant, we claim, is clear; consequently it was unnecessary for the plaintiff to make any proof of extraneous facts for the purpose of aiding in its construction, and especially not of the fact that no sales of public land had been made in this State, at the time of such grant, because it would in nowise assist his case. But the defendant relies upon such fact for the purpose of aiding and supporting a construction of the grant favorable to it alone, and to show, also, that its plain words were used in a sense not warranted by grammatical rules. Such being the case, it was certainly incumbent on the defendant to show that the fact which it is claimed would so control the words of the grant, and authorize a construction in its favor, really existed. Again, if the words of a grant are plain, they alone should govern, and no extraneous fact or circumstance should be resorted to for the purpose of placing an unusual construction upon them. (2 Parsons on Contracts, 494, 6th ed.; *Whitney* v. *Whitney*, 14 Mass., and note.)

Now then, if Congress could make a present grant of lands not identified, or which, as the Supreme Court say in the case of *Schulenberg* v. *Harriman*, require a survey to locate them; or if it can divest the government of the title to such lands, how can the fact that no survey had been made warrant the conclusion that it did not intend a present grant of such lands, when the words employed by it admit of no other construction than it did so intend?

And the authorities we have referred to warrant the conclusion that if the general government used words of present grant, or intended a grant *in præsenti*, it will be held to be such, notwithstanding the title could not vest in a grantee; and when such grant is made, the government could not afterwards dispose of the lands so granted to any other person, as it is claimed in this case was done by the act of 1866.

However, here the description of the land was sufficient, or rather it was sufficiently identified at the time of the grant; for, in law, everything is certain which can be made certain. (*Sterling* v. *Blair*, 4 Bibb. 288; *Armstrong* v. *Mudd*, 10 B. Monroe, 144.)

The sixteenth and thirty-sixth sections in each township could certainly have been located or identified by any surveyor, under the system of survey adopted by the United States, and existing at the time of the grant to the State of Nevada; so that under the strictest rule of the common law, even, the want of the survey and location would not have the effect to postpone the operation of the grant, provided its words constituted it one *in præsenti*. In support of the view that the grant was one *in præsenti*, see *Higgins* v. *Houghton*, 25 Cal. 255; *Veeder* v. *Guppy*, 3 Wisc. 502; *Schulenberg* v. *Harriman, supra; Langdeau* v. *Hanes, supra; Summers* v. *Dickinson*, 9 Cal. 554; *Owens* v. *Jackson*, 9 Cal. 323; *Kernon* v. *Griffith*, 27 Cal. 87; *Sherman* v. *Buick*, 45 Cal. 656; *Thompson* v. *True*, 48 Cal. 601.

V. That in a grant of this kind it is not necessary that there should be a grantee, we refer the court to the following cases: *Town of Pawlet* v. *Clark*, 9 Cranch, 292; *White's Lessees* v. *Cincinnati*, 6 Peters, 431; *McGirr* v. *Aaron*, 1 Penn., Pen. & W. 49; *Wetman* v. *Lex*, 17 Sergt. & Rawle, 88; *Burr's Executors* v. *Smith*, 7 Vt. 241; *Inglis* v. *Sailors' Snug Harbor*, 3 Peters's S. C. R. 99; *Shapleigh* v. *Pillsbury*, 1 Greenleaf, 271; *Rice* v. *Osgood*, 9 Mass. 38; *Veeder* v. *Guppy*, 3 Wisc. 502.

VI. It is, however, claimed that if the land in question was granted by the act of 1864, and that it was a present grant, still, by the act of its legislature of February 13,

1867, the State relinquished such grant, or rather accepted it with the conditions imposed by a subsequent act of Congress approved July 6, 1866.

We answer to this position: First. That the act of Congress referred to is clearly prospective in its terms, applying only to future acts or grants. Not a word appears in it indicating that grants already made were to be affected by it. And, indeed, the act does not purport to annul any grants, but only to regulate the survey of public lands afterwards to be made. We do not deny that the legislature of this State, in accepting the grant, appeared to think that some qualification was attached to the grant already made to the State; but if none were made, the fact that the legislature thought so cannot create such qualifications.

Second. The law clearly only applies to land belonging to the United States at the time of the last act, mentioning, as it does, only the public lands; hence, if the sixteenth and thirty-sixth sections had already been granted the act did not affect them, or the title to them, for they were no longer public land.

But suppose it to be true that Congress intended by this last act to annul grants already made to the State (a conclusion not warranted by any word in the statute); in other words, suppose it had in terms declared that the grants of the sixteenth and thirty-sixth sections, heretofore made to the State, should be annulled, and the State had, by the act of February 13, 1867, approved such act of Congress, we still say that the whole proceeding would have been void and of no force under our Constitution, because the lands granted by the enabling act were, by the Constitution, irrevocably appropriated for the benefit of public schools. (Const. Nev., Art. XI, Sec. 3.)

It will be seen upon examination of this section that sections sixteen and thirty-six are set apart for the purpose mentioned. Now, it needs no argument to show that those sections having been thus appropriated by the Constitution, no act of the legislature of Nevada, nor of the legislature and Congress combined, could divest the State of the title

to the land so appropriated; that the legislature could only control it for the purposes designated in the section itself. To allow the legislature to relinquish its title to these lands would simply be to allow it to alter the Constitution of the State.

Nor will it do to say that because the legislature may have the power to dispose of those lands therefore it could relinquish its title to them. We say it had no power to deal with them, except for the benefit of schools, and it cannot be said that to relinquish its title for another purpose comes within such power of disposition. Nor will it do to say that it could relinquish its title to the sixteenth and thirty-sixth sections, and take other lands in lieu thereof. If it could so exchange the lands, it could dispose of them in any other way that it might think proper; whereas, we claim, that as to those lands the State was equitably a trustee, holding those particular sections for one, and only one, purpose—that of public schools.

VII. In support of the proposition that mineral land, like any other, will pass by a grant of this kind, we refer the court to *Cooper* v. *Roberts,* 18 Howard; *Sherman* v. *Buick,* 45 Cal.; *Higgins* v. *Houghton,* 25 Cal.

*C. E. De Long,* for Respondent.

I. Counsel for appellant in their opening argument assume three positions as true, viz.:

1st. That a grant of lands to a State is in the nature of a contract.

2d. That such grants should be liberally construed in favor of the grantee; and

3d. That the language employed in the enabling act is that of a present grant and unambiguous.

The first of these positions, if true, subjects the appellant at once to the plain rule, that to make a contract requires the existence and agreement of *at least two parties capable of contracting.* It also subjects the parties to the law of contracts, and therefore grants may be of as various kinds as ordinary contracts; that is, they may be executed or exec-

utory, and they may be changed or varied by subsequent
agreements, which changes may be found to have occurred
upon proof of a proposal by one party to changes, and rati-
fication or long-continued acquiescence be shown on the part
of the other party; or by proof that an unexecuted contract
is changed by one of the contracting parties, and followed
by an acceptance on the part of the other of the fruits of the
contract without objection to the change or upon a specific
consent thereto.

The second position I entirely challenge, and deny that
it is law.

The author in 2 Greenleaf's Cruise, 912, lays down the
following rule: "The king's grants are construed in a very
different manner from conveyances made between private
subjects, for being matter of record they ought to contain
the utmost truth and certainty; and as they chiefly proceed
from the bounty of the Crown, they have at all times been
*construed most favorably for the king, and against the grantee,*
contrary to the manner in which all other assurances are
construed."

That this was and is the common law rule cannot be suc-
cessfully disputed. That this rule has been accepted and
adopted by the Supreme Court of the United States in one
of the most celebrated cases ever decided by that court, is
also true. (Vide *The Charles River Bridge Corporation* v.
*The Warren Bridge Corporation*, 11 Peters, 420.)

This case, however, was not the first in which that court
laid down this rule. (Vide *The United States* v. *Arredondo*,
6 Peters, 691, in which case it is said that "in grants by
the public, nothing passes by implication." See also *Hogan*
v. *Campbell*, 8 Port. (Ala.) 34; *Rice* v. *Railroad Co.*, 1 Black,
379, 380; 2 Blackstone's Com., Sec. 347; 2 Hilliard on Real
Property, 369, Sec. 56.)

II. The language of the enabling act is not that of a pres-
ent grant. The words "shall be and are hereby granted,"
are, I admit, words of a present grant when occurring
*disassociated* from other language; but when used as they
were in this case in a statute which might never become a

valid law, as the inhabitants of the then Territory of Nevada might never have availed themselves of the privileges conferred upon them by that act, and as the whole scope and purport of the act of Congress was one depending upon and looking to the happening of future events, it is an abuse of language to claim that it was a present grant. At the time the act was passed there was no grantee in existence; the grantee named might never have an existence, and the statute become as nugatory as a similar act passed the same day by the same Congress conferring similar rights upon the people of the Territory of Colorado. (See 13 U. S. Statutes, 32.)

Again. The language in the act under consideration is no more applicable to sections sixteen and thirty-six than to the other lands contiguous thereto, which the State was to receive in lieu, in the event such sections had been sold or otherwise disposed of.

Certainly the government of the United States did not intend by this statute to grant to the State of Nevada any more lands in the aggregate than all of sections sixteen and thirty-six in each township would amount to. This language then does render this grant ambiguous to the extent at least that it looks to an ascertainment in some manner of certain facts before the grant could be given an operation upon any certain lands. Even giving the grant the construction counsel claim for it, and it is not pretended that any portion of these sections sixteen or thirty-six were granted to the State of Nevada if at the date of the passage of the enabling act any such portion of such sections had been sold or otherwise disposed of, in such an event other lands were granted. What other lands? Who was to determine this; and how and when was this to be determined?

Is it fair to presume that Congress intended to give this grant a present effect, when there was no person to receive the thing granted ; when there might never be a grantee; when the thing granted was not ascertained, and could not be for a long time at least; and when the grant was so indefinite, that until rendered definite Congress would practi-

cally be estopped from disposing of any of the remainder of the public domain in order to give this grantee, first, the specific sections mentioned, in the event they were not already granted; and secondly, contiguous lands if they were granted?

How can the grant to the State of Nevada be construed otherwise than as a grant of quantity?

It cannot be said to be a grant of specific lands, because in one event sections sixteen and thirty-six in each township passed; but in another event entirely different lands were to pass. The State simply obtained by that grant a certain quantity of lands, and as the court in this case say, a survey and segregation became necessary in order to attach the title to any specific lands.

If the title did not pass out of the United States and into the State of Nevada before such segregation and survey, then it of course remained in the United States, and that authority retained still its power of disposition of the public domain wholly untrammeled, except that it was bound in the event of its having disposed of any of the specified sections before survey, to grant the State of Nevada other lands equal in quantity and as contiguous as possible in lieu thereof.

Counsel seek to strengthen their case by reference to the tense of the exception contained in the grant. They claim that the words, "have been disposed of," refer to the date of the grant and not to the date of its application. In other words, they claim that sections sixteen and thirty-six were granted, unless when the enabling act was passed they were in whole or in part sold or otherwise disposed of. I claim, on the contrary, that without reference to subsequent acts of Congress or other matters extraneous of the statute, this language does not bear the import counsel would attach.

The language, "shall be and are hereby granted," was not used or intended to be understood as in the present tense, although thus sounding grammatically; and why not? Because there was no grantee to take the thing. The act

looked to the creation of a grantee; and by no possibility can it be reasonably claimed that in a strict sense it was used or intended to be considered as having a present effect at the date of the grant. The same reasoning applies with even greater force to the additional language, "have been sold or otherwise disposed of."

Certainly Congress did not intend to prohibit itself from selling or disposing of any public lands in this then Territory, after the passage of that act and before the question should be finally decided as to whether the people of Nevada would form a State government and be admitted into the Union as a State. It might be years before the happening of this event, and yet if counsel are correct in their construction, although the fee has not nor could not have passed out of the United States, yet it, the government, by its own act had placed its powers in abeyance so completely that it could not sell or otherwise dispose of any of the public domain within this Territory, that might, if Nevada should become a State, and if the public surveys were at any time thereafter extended therein, happen to fall within certain township section lines.

Is it not the fairer construction to say that this language throughout was intended to apply to that moment of time when the grant attached, or, as the Supreme Court say in the case of *Schulenberg* v. *Harriman*, when "the title, which was previously imperfect, acquired precision and became attached to the land"? Under the construction counsel claim, what results follow? The United States in a moment parts with its title to an unknown tract of land. No other person acquires that title, for some time at least. When it does acquire the title, neither grantor nor grantee for a great length of time know what has been parted with by the one, or received by the other. The grantor is paralyzed in its power of disposing of the public domain, lest it by chance should dispose of something already granted.

Citizens of the United States residing and doing business in the new State prior to the surveys occupy and improve the public domain at the risk of losing everything

they possess, if, when the surveys are subsequently made, it so chance that they are upon the granted lands. They cannot tell where to go, or what to do. Appealing to the United States they can obtain no relief or guidance whatsoever; and even the State authorities are powerless to advise them relative to their rights. A scene of confusion follows, to settle down by degrees as the public surveys are made; and two men equally innocent of any wrong intent, the one happening to be without, and the other within some charmed circle of a sixteenth or thirty-sixth section, as established by survey, differ in this: that one is lucky and keeps all he has; and the other is unlucky and loses his possessions and labor of years. It is preposterous to assume that Congress ever intended to legislate so as to produce any such evil and ridiculous consequences.

Beyond this, I claim that this language employed in the act of Congress can only be given a meaning such as I claim for it, because at the date of the passage of the enabling act, Congress had not sold or otherwise disposed of any of the public domain within the then Territory of Nevada; and to give it the other construction would be to convict Congress of having done an ignorant, foolish act. (Smith's Com., Secs. 486, 488.)

In the absence of any evidence upon the point at all I cannot believe that the court will presume that lands within this State had been sold or disposed of. If the appellant could have shown upon the trial of this cause that any such sale or disposition had been made, it would have aided his cause to the extent that it would have rendered it possible for Congress by that clause in the grant to have referred to lands at that time sold or disposed of; whereas, without such showing and with no presumption in favor of any such fact, it makes such a construction one simply ridiculous.

Is it not the more harmonious and consistent construction to place upon this whole grant to say that what Congress meant by this section was to give to the State of Nevada so much land as the aggregate of the sixteenth and

thirty-sixth sections would amount to? In all cases giving the identical sections themselves when the land was surveyed, and for the first time in a final condition to pass to the grantee provided no other disposition had, in the meantime, been made by Congress of the whole or any part of such sections?

III. Appellant's counsel next proceed to maintain the proposition that there may be a grant without a grantee *in esse*, and in support of that opinion refer to the one reported case, to wit, that of *Pawlet* v. *Clark* (9 Cranch, 321), and the authorities cited by Judge Story in rendering the opinion of the court.

Against this solitary opinion is arrayed an unbroken current of authority, in all of the text-books and reports that I have had the time to examine. (2 Sheppard's Touchstone, Secs. 229, 234; 2 Hilliard on Real Property, 375; 12 Peters, 298, and authorities there cited; 2 Blackstone's Com. 296; *Cooper* v. *Cory et al.*, 8 John. 387; Co. Litt. 3 a; 10 Co. 26, B. 1.)

Appellant's counsel claim that this grant was sufficiently certain, because, they say, anything is certain that can be made certain. Conceding the truth of this general principle, yet I beg to inquire how this grant was to be made certain? The only answer that can be made is, by the surveys. This very answer proves when for the first time the title of the grantee to the specific thing granted attaches. But will this reply cover this case? Suppose, when this survey was made, part of the land included by the surveys within some of the sections sixteen and thirty-six are found to be lands sold or disposed of under some act of Congress prior to the grant: who is to designate, and how and where is the designation to be made of the lands which the State may receive in lieu? Certainly the grantor is to be heard, if indeed it is not him alone that is to be heard, in making the designation.

IV. Counsel in their argument next anticipate my suggestion that the State, by act of the legislature of February 13, 1867, ratified and consented to the construction placed

by Congress upon this grant, to wit: that it did not include mineral lands; and accepted it, the grant, with the conditions and construction annexed. But in reply, counsel say that the act of Congress of July 6, 1866, is clearly prospective in its terms, having application only to future grants, and not to this one. Now, let us consider this. In the first place, the act is one entitled "An act concerning certain lands granted to the State of Nevada."

Counsel's grammar, if invoked here as a rule of construction, will be found to defeat their argument.

This act, then, clearly refers to grants already made as well as grants being made by this very act, and finally treating of all grants made and then being made to the State.

Counsel next argue that this act could not have been intended to affect the lands granted to the State, because it refers only to public lands. In reply I beg to ask, What are public lands in practice and common understanding? The answer is: All unsurveyed, unsegregated lands are public lands in the common acceptance of the term. In other words, public lands are all lands not private lands.

Private proprietorship cannot attach until after survey. and segregation. This elucidates the whole of my argument. By reference to the land laws and regulations of the government, including acts of Congress and rules governing the land department, it will be seen that uniformly all lands surveyed are classed as public lands. (See Lester's Land Laws and Regulations, Vol. 1, 703, and following.)

I also refer to an act of Congress, approved February 15, 1843 (Lester's Land Laws, Vol. 1, 82), authorizing the States of Illinois, Arkansas, Louisiana and Tennessee, to sell lands appropriated for school purposes.

When lands are granted to a State or an individual by township and section, which township and section have not as yet been defined, this constitutes an inchoate, incomplete grant; a grant of quantity and not of quality. The United States retains the complete power to direct and regulate its surveys to suit its own pleasure. And this power, if in any manner doubtful, if declared and exercised, be-

came a condition annexed to the grant, and the State of Nevada had its privilege to accept the grant not yet delivered, with the conditions annexed, or to refuse to do so. The State can only speak, in contracting, through its legislature and executive. It did speak by the act of 1867.

V. Counsel next contend that, by Section 3 of Article XI of our State Constitution, which they assert disposed of these lands, the grant became operative and fixed, to such an extent that neither Congress, nor the State legislature, nor both combined, could alter or change it.

In reply, I beg to say, that in the first place nothing more was done or attempted to be done by that clause than to control the State legislature in the use they should subsequently make of certain lands or proceeds of lands inuring to the State. In terms this clause applies to "lands hereafter to be granted," as well as those already donated. It applies also to moneys derived from escheated estates, etc. In short, it is a general restrictive clause directing and governing the legislature in the future in the uses to be made of lands and moneys.

No clause of acceptance is therein contained, nor could there be. This instrument was, of course, one wholly meaningless and inoperative at the time of its execution; it looked to adoption by the people, and a subsequent adoption, or ratification, by Congress; and after all this should happen, what is it? It is not a law in the sense of a statute, but of itself is inoperative, looking to subsequent legislation for its enforcement or execution. Besides this, the legislature, in accepting this grant exclusive of mineral land, did nothing in contravention of any direction contained in the clause of the Constitution referred to. It neither accepted a less quantity of lands than originally donated, nor did it divert or attempt to divert them from the use directed, viz., for the support of schools. There is nothing in that clause of the Constitution restricting or forbidding the legislature from accepting certain lands, and waiving any claim to other certain lands; and without such restriction expressly stated, the right in the legislature existed.

By the Court, HAWLEY, C. J.:

This is an action of ejectment to recover a portion of the west half of the southwest quarter of section sixteen, township sixteen, range twenty-one east, Mount Diablo base and meridian. The appellant claims title under a patent issued to his grantors and predecessors in interest by the State of Nevada, on the 14th day of July, 1868, under and by virtue of the statute authorizing the conveyance of lands granted to the State by the seventh section of the enabling act of Congress, entitled "An act to enable the people of Nevada to form a constitution and State government, and for the admission of such State into the Union on an equal footing with the original States," approved March 21, 1864, which reads as follows: "That sections numbers sixteen and thirty-six in every township, and where such sections have been sold or otherwise disposed of by any act of Congress, other lands equivalent thereto in legal subdivisions of not less than one-quarter section, and as contiguous as may be, shall be and are hereby granted to said State for the support of common schools." (13 U. S. Stat. 32; Stat. 1864–5, 37.) The respondent claims title under a patent issued to it by the United States, on the 7th day of March, 1874, under and by virtue of the act of Congress entitled "An act granting the right of way to ditch and canal owners over the public lands and for other purposes," approved July 26, 1866 (14 U. S. Stat. 251), the act amendatory thereof, approved July 9, 1870 (16 U. S. Stat. 217), and the act entitled "An act to promote the development of the mining resources of the United States," approved May 10, 1872 (17 U. S. Stat. 91).

The land in controversy is mineral land, and the respondent is in possession of the same and is engaged in conducting and carrying on the business of mining thereon, and has erected improvements thereon for mining purposes of the value of over eighty thousand dollars. In the year 1867, prior to the date of the survey, or approval of the survey of said land by the government of the United States, the

grantors and predecessors in interest of respondent entered upon the land for mining purposes, and claimed and occupied the same in conformity with the laws, customs and usages of miners in the locality and mining district in which said land is situate, and were so possessed and engaged in mining thereon when said land was first surveyed, and when this State issued its patent to the grantors and predecessors in interest of appellant.

The case is one of unusual interest, and involves principles of great importance. It has been ably argued by learned counsel, and has received the careful attention of this Court. Two leading questions are presented for our consideration in determining the legal rights of the respective parties. First. When does the title vest in the State to the sixteenth and thirty-sixth sections granted by the seventh section of the enabling act? Second. Does the patent issued by this State include the mineral lands?

After a thorough examination of all the authorities cited by counsel, we do not deem it necessary to decide whether the grant is one *in præsenti* or *in futuro*. Assuming, for the sake of the argument, that the proper construction to be given to the seventh section of the enabling act is, as claimed by appellant, that the grant took effect absolutely upon the admission of this State into the Union, and that the title to said lands then vested in this State, although subsequent proceedings might, as was said in *Schulenberg* v. *Harriman* (21 Wall. 62), "be required to give precision to that title and attach it to specific tracts," and likewise assuming that Congress had no power after the admission of this State into the Union to impair the grant, without the consent of this State; still, we think it must be admitted that Congress could thereafter, with the consent of this State, prior to the disposal by the State of any of the lands embraced in said sections, and at any time prior to the survey, change the terms of the grant, and we are of opinion that by the subsequent act of Congress and the act of acceptance by the legislature of this State, the mineral lands were reserved from sale by the government of the

United States, with the consent of this State, and that the patent issued by this State did not, upon the admitted facts of this case, include the mineral lands in controversy. If we accept the definition announced by text-writers, "that a grant is a contract; executed, it is true, but still a contract" (3 Parsons on Contracts, 527), and it was so decided in *Fletcher* v. *Peck* (6 Cranch, 87), it would be within the power of both parties, by mutual consent, to modify or change the terms of the contract after its execution; and if we adopt the rule as stated by Field, J., in *Schulenberg* v. *Harriman, supra,* that "a legislative grant operates as a law as well as a transfer of the property, and has such force as the intent of the legislature requires," the same principle follows, and the law could be changed or modified at any time by the consent of both parties before the rights of others attached, certainly this must be true unless there is some constitutional provision against such acts of legislation.

In *Higgins* v. *Houghton* (25 Cal. 255), where it was held that the State of California, by virtue of the grant of March 3, 1853, which in some respects is similar to the grant under consideration, "became the owner of the sixteenth and thirty-sixth sections absolutely, not only as to quantity, but as to position also," the court impliedly recognized the fact that it was within the power of Congress and the State by mutual agreement to change the provisions of the grant. After stating that there had been no legislation by Congress prior to the grant which would interfere with the conclusions reached in said case, the court said: "And if there has been any legislation since the grant that conflicts with the conclusion, it must be null and void *unless, indeed, it has been acceded to by the grantee.*" Here such subsequent legislation was had by Congress *and it was acceded to by the grantee.*

After the sixteenth and thirty-sixth sections had been granted, and after this State had been admitted into the Union, Congress passed an act entitled "An act concerning certain lands granted to the State of Nevada," approved

July 4, 1866. After confirming the appropriation made by the Constitution of this State to educational purposes of the land granted to this State by the law of September 4, 1841, and providing for the appointment of a "surveyor-general for Nevada," who was to perform certain duties therein prescribed under the direction of the secretary of the interior, it was further enacted: "That in extending the surveys of the public lands in the State of Nevada, the secretary of the interior may, in his discretion, vary the lines of the subdivisions from a rectangular form to suit the circumstances of the country; but in all cases lands valuable for mines of gold, silver, quicksilver or copper, shall be reserved from sale." (14 U. S. Stat. 85–6, Sec. 5.) This State in accepting the grant unequivocally consented to the reservation by Congress of the mineral lands, and accepted the grant with all the conditions and reservations mentioned in said section. The act, passed by the legislature of this State, entitled "An act in relation to and accepting the lands granted to the State of Nevada by the government of the United States," approved February 13, 1867, is explicit upon this point. It reads as follows:

" SEC. 1. The State of Nevada hereby accepts the grants of lands made by the government of the United States to this State, in the following acts of Congress, to wit: 'An act donating public lands to the several States and Territories which may provide colleges for the benefit of agriculture and the mechanic arts,' approved July 2, 1862, as amended and approved April 14, 1864, and as extended July 4, 1866, by an act entitled 'An act concerning certain lands granted to the State of Nevada,' upon the terms and conditions in said acts expressed, and agrees to comply therewith.

"SEC. 2. The State of Nevada hereby accepts the grants of lands made by the government of the United States to this State, in the act of Congress entitled 'An act concerning certain lands granted to the State of Nevada,' approved July 4, 1866, upon the terms and conditions in said act expressed, and agrees to comply therewith.

"SEC. 3. The State of Nevada hereby accepts *all grants*

of public lands *heretofore made* by the government of the United States to this State, *upon the terms and conditions so granted, as modified in the act of July* 4, 1866, *above in this act referred to.*"   (Stat. 1867, 57.)

This act was passed prior to the survey, by the United States, of the land in controversy, which, from the record in this case, is shown to have been made in August, 1867.

This State, by its act of acceptance of the grant as modified by the act of Congress of July 4, 1866, was estopped from thereafter claiming title to any lands valuable for mines of gold, silver, quicksilver or copper, for such lands were, by said act, expressly reserved from sale.   It is evident that when Congress passed the act of July 4, 1866, it thought that by the effect of the grant and the law of the event, that this State would not acquire an absolute ownership in the lands until the surveys were made; but even if it was mistaken as to the legal effect of the grant, its action received the sanction and approval of this State before the title of the State, under any rule of construction, absolutely attached *to any specific tract of land.*   If it be conceded that the State had a vested title to the mineral lands contained in the sixteenth and thirty-sixth sections, prior to the act of February 13, 1867, it is certain that by said act it relinquished its rights thereto, and thereby agreed to accept other lands in lieu thereof.

The passage of said act was a recognition by the legislature of this State of the validity of the claim made by the government of the United States to the mineral lands.

Whatever might, therefore, be the construction of the language of the enabling act, as interpreted from the act itself, we think it is controlled by the subsequent legislation we have referred to, and that the title of the State to the land conveyed to appellant's grantors was, at the time of the survey thereof, subject to the terms and conditions imposed by the act of Congress of July 4, 1866, and as the portion of said land in controversy in this action was then "rich in minerals," and occupied and claimed by respondent's grantors for mining purposes, the grantors of

appellant acquired no title thereto by virtue of the patent issued by this State.

Against the views we have above expressed, counsel for appellant make three objections: 1. It is first argued that the act of July 4, 1866, is prospective in its terms, and that it only applies to future acts or grants. We think that the act, when read entire, is susceptible of but one construction. It refers to lands granted prior to, and at the time of, the passage of the act. The title of the act clearly indicates that it was the intention of Congress to make the act apply to lands already granted: "An act concerning lands *granted* to the State of Nevada;" not lands to be thereafter granted, but lands granted by that and other prior acts of Congress. The construction we have placed upon this act must certainly be correct, if it be true, as was argued by appellant's counsel upon another branch of this case, and held to be the law in *Whitney* v. *Whitney* (14 Mass. 92), that we should not be encouraged to direct our conduct, in arriving at the intentions of the legislature, "by the crooked cord of discretion, but by the golden metewand of the law;" that we are not to construe statutes by equity, but to collect the sense of the legislature by a sound interpretation of its language, according to reason and grammatical correctness. But we do not think there is any room for argument as to its meaning. It applies to all grants made by Congress to the State of Nevada, where the lands granted had not been surveyed by the government of the United States, and included the grant mentioned in the enabling act, and such was the evident understanding of the legislature of this State when it passed the act of acceptance, approved February 13, 1867.

2. It is argued that the act of Congress applies only to the public lands then belonging to the United States, and it is claimed that inasmuch as the sixteenth and thirty-sixth sections had already been granted, the act did not affect the title to them, as they were no longer public lands. An examination of the various acts of Congress relative to the surveying of the public lands, has convinced us that the word public is applied by Congress to all the unsurveyed

lands, whether the same or any portion thereof had been previously granted or not.

All lands are public within the meaning of that word, as used in the act referred to, until the survey is made. This is necessarily so, because, until the surveys are made, the rights of the grantee to any specific tract of land could not be ascertained; hence it is that the word public is used to distinguish the unsurveyed from the surveyed and segregated lands where the rights of private proprietorship has attached.

3. The last objection argued by appellant's counsel is, that the act of February 13, 1867, is in violation of the third section of Article XI of the Constitution of this State. It is claimed that by the provisions of said section, the sixteenth and thirty-sixth sections are set apart and dedicated to the public schools, and that it was not, therefore, within the power of the legislature to relinquish the title of the State to these sections. Section 3 provides that "all lands, including the sixteenth and thirty-sixth sections in every township, donated for the benefit of public schools, in the act of the thirty-eighth Congress, to enable the people of Nevada Territory to form a State government,    *    *    * shall be and the same are hereby solemnly pledged for educational purposes, and shall not be transferred to any other fund for any other uses," etc.

The plain object of this provision of the Constitution was to prevent the legislature from passing any law that would appropriate the proceeds received by the State from the sale of such lands to any other than educational purposes. The title to said sections is vested in the State, not in the schools. The lands are solemnly pledged to educational purposes, and when sold by the State the proceeds arising therefrom must, under the provisions of the Constitution, be paid into the school fund, and only be used for educational purposes, "and shall not be transferred to any other fund for any other uses." The same disposition must also be made of the proceeds derived by the State from the sale of lands selected in lieu of the sixteenth and thirty-sixth sections. There is noth-

ing in the act which attempts to make any disposition of said lands for any other than educational purposes.   The school fund is fully protected, and, in our opinion, this provision of the Constitution has not been violated.

We have not, in this opinion, considered the legal effect of the joint resolution of Congress, approved January 30th, 1865, which provides that no act passed at the same session of Congress as the enabling act "shall be so construed as to embrace mineral lands, which in all cases shall be and are reserved exclusively to the United States, unless otherwise specially provided in the act or acts making the grant," and which was construed by the secretary of the interior to exclude from the operation of the enabling act all mineral lands (Copp's U. S. Mining Decisions, 31); nor have we deemed it necessary to discuss many other points that were urgently pressed by counsel, as the result we have reached, upon the points decided, are in our judgment conclusive of this case.

The judgment of the district court is affirmed.

Beatty, J., concurring:

I concur in the decision of the Court, but I dissent from the views expressed in the foregoing opinion upon one point of great practical importance; and, for that reason, feel obliged to state very briefly the grounds of my dissent.

In the first place, I think there is no room for construction as to the meaning of the grant.   It means, and has the exact effect of, what it says.   It is part of an act prescribing the different steps the people of Nevada Territory should take, in a certain order and at fixed dates, to form a State government.   If they had failed to comply at least substantially with the terms of the enabling act, or if the President of the United States had not approved the constitution adopted by the people, and had refused to proclaim the admission of the State, the grant would never have taken effect.   But when the people of Nevada did comply with all the provisions of the enabling act, and the President of the United States proclaimed the admission of Nevada as a

State of the Union, *eo instanti* the title to the sixteenth and thirty-sixth sections vested in the State. That title did not of course attach to any specific parcels of land till the survey was made, but in the meantime Congress had no power to make other disposition of the sixteenth and thirty-sixth sections *eo nomine*, nor could it dispose of specific tracts so as to defeat the title of this State if, on the completion and approval of the public surveys, those tracts were found to include any part of the sixteenth or thirty-sixth sections. These points are clearly settled in the authorities referred to on the oral argument of the case, and cited in the appellant's printed brief, and none of the distinctions which respondent attempts to draw between this case and those referred to has any existence. The argument that this grant did not take effect at the time of the admission of the State into the Union because when it was made there was no grantee *in esse*, is well answered by the quotation from the decision of *Schulenberg* v. *Harriman, supra.* If it is really the rule of law that there can be no grant without a grantee *in esse* (which is a doubtful proposition), it is merely a rule of law, and a very technical rule of law, applying to transactions between private persons; but certainly the rule is not superior to the legislative will, and when a grant is made by law it operates according to the intent of the legislature, not only as a grant, but as a law, and if it is in conflict with any existing rule of law, then such rule is *pro tanto* repealed. The same reasoning applies to the objection that there was no specific thing in existence to be granted. If Congress desired to grant to a grantee *in posse* lands not segregated, but to be segregated thereafter from other lands of the United States, it could do so notwithstanding any pre-existing law, because it could make a law for the occasion. And finally, as counsel for appellant clearly point out, if the arguments of respondent on these points are valid at all they prove that Nevada has not acquired any title to any lands by virtue of the several grants made by Congress. But the strong argument of respondent, or at least the one upon which he insists most strongly, is that the grant in the en-

abling act should be construed as if it had read, "That sections numbered sixteen and thirty-six in every township, and where such sections *shall have been* sold or otherwise disposed of *(before final survey)* by act of Congress, other lands equivalent thereto," etc.; that it should be so construed because Congress had not disposed of any of the lands in Nevada Territory prior to that time; and unless we interpret the grant of *lieu* lands to be in place of lands to be subsequently disposed of, we convict Congress of ignorance and folly, etc. Besides the answers of appellant to this position, which are quite sufficient for the purpose, there is a much more complete answer. The whole argument rests upon the assumption that no lands had been disposed of in Nevada Territory by act of Congress prior to the enabling act. But the fact is, that several extensive Indian and military reservations had been set apart by the President under the authority of acts of Congress within the boundaries of this State. Not to mention others, the two extensive Indian reservations on the Truckee and Walker Rivers, embracing many thousands of acres, and necessarily including several sixteenth and thirty-sixth sections, had been laid off pursuant to acts of Congress long before the passage of the enabling act. The simple mention of this fact sweeps away the whole foundation of respondent's argument. My conclusion, therefore, as above stated, is, that the title to all the sixteenth and thirty-sixth sections vested in the State at the moment of our admission, and that our title has attached as fast as the surveys have been approved, unless the effect of the grant has been changed by subsequent agreement between the State and the United States. I do not differ from the Court in the opinion that the terms of the grant might be altered to any extent by mutual agreement of the parties. But the legislature cannot make any agreement in behalf of the State which will be in conflict with the Constitution of the State. Now, the Constitution (Art. XI, Sec. 3) dedicates the land granted in the enabling act to the school fund, and, in my opinion, deprives the legislature of the power to *give it away*. The legislature of course

has the power to convey the lands of the State upon such terms and conditions as it may judge expedient, being restricted only in the application of the proceeds. But I do not think the legislature can give away the school lands without getting anything in exchange. But the opinion of the Court, assuming that the title to every one of the sixteenth and thirty-sixth sections, whether mineral lands or not, was in the State before the passage of the act of February 13, 1867, holds that the effect of that act was to revest the title to all mineral lands in the United States, and *to agree to accept other lands in lieu thereof.* Now, there is not one word in any act of our own legislature which, in my opinion, will bear the construction that we are to get anything in exchange for the mineral lands which the legislature no doubt intended to surrender. And there is nothing in any act of Congress which can be construed into a grant of anything in exchange for such surrender. The congressional interpretation of the grant in the enabling act is expressed in the joint resolution of Congress, quoted in the opinion of the Court, and that is, that the mineral lands never were granted to the State—and the act of Congress of July 4, 1866, is evidently based upon that assumption. Of course, therefore, it offers nothing in exchange for lands which it regarded as all the time the property of the United States—never granted, and, consequently, never resumed. If, then, the legislature relinquished to the United States, by the act referred to, the title to the mineral lands, it relinquished it for nothing. In other words, it gave the lands to the United States. Now, if it could give one section to the United States, it could give all the lands of the State to the United States; and if it could give them to the United States, it could give them to John Smith—a proposition that I am not prepared to admit. My conclusion is—and it is here that I differ from the Court—that all the sixteenth and thirty-sixth sections in the State, whether mineral lands or not, belong to the State, unless they had been disposed of by act of Congress prior to the passage of the enabling act.

But I do not think the appellant can derive any advantage from this conclusion, for the legislature has acquiesced in the congressional interpretation of the grant—that it does not embrace the mineral lands—and has agreed that they shall be reserved from sale.  That agreement is not, in my opinion, binding upon future legislatures, and at any future time this State may dispose of its mineral lands.  But the act providing for the disposal of the lands of the State, by virtue of which the appellant claims, is to be construed with reference to the act of February 13, 1867.  The fact that that act is, in part, unconstitutional, does not preclude resort to its provisions for the purpose of construing an act *in pari materia*.  Construed in the light of its provisions it is plain that the act under which appellant claims title does not provide for the sale of mineral lands.  The grantor of appellant, when he applied to the State register for the land in question, knew that he could obtain no title to it under the existing law if it was mineral land, because no officer of the State was empowered to convey that sort of land.

It is for these reasons that I think the judgment should be affirmed.