## UNITED STATES *v.* WILLIAMS.

*(Circuit Court, D. Nevada. November 23, 1886.*

1. PUBLIC LANDS—"WHAT ARE APPROPRIATED."

    By act of congress approved June 16, 1880, there was granted to the state of Nevada 2,000,000 of acres of land, in lieu of the sixteenth and thirty-sixth sections of land theretofore granted for school purposes, the same to be selected from "any unappropriated, non-mineral land in said state," in the manner provided in said act. *Held,* that lands of which parties had been in the peaceable possession for several years, and on which they had erected costly and valuable improvements prior to the passage of the act, and prior to any selection thereof by the state, were *not* "unappropriated * * * public lands," within the *meaning* of said act.

2. SAME—LANDS SUB JUDICE.

    While a contest is pending and undecided in the general land-office, as to the right of the state to select certain lands, and have the same listed to it, such lands are *sub judice,* and not within the terms of said act.

3. SAME—FRAUD IN OBTAINING TITLE.

    Where title to government land has been obtained by fraud perpetrated upon the officers of the general land-office, the United States can maintain a suit to vacate and set aside such transfer of title.

*(Syllabus by the Court.)*

In Equity.

*Trenmor Coffin*, U. S. Dist. Atty., *James D. Torreyson* and *Wren & Cheney*, for complainant.

*T. W. Healy* and *R. M. Clarke*, for respondent.

SABIN, J.  This suit is brought to cancel and vacate a listing of certain lands to the state of Nevada, which listing is alleged to have been procured by the fraudulent acts of parties unknown, or by mistake, misadventure, or inadvertence of the officers of the land department at Washington.  The lands affected by the suit are described as the E. ½ of the S. E. ¼ of section 33, and W. ½ of the S. W. ¼ of section 34, all in township 8 N., range 50 E., Mount Diablo base and meridian, situate in Nye county, state of Nevada.

The amended bill set out the alleged frauds and mistakes by reason of which the lands were listed to the state quite fully and in detail.  The bill avers.

That on May 19, 1879, the respondent, Williams, made desert-land entry No. 158, at the land-office at Eureka, Nevada, for 240 acres of land, which entry embraced the lands above described, with other lands; that on July 26, 1879, in consideration of $5,000 then paid to him by the New Philadelphia Silver Mining Company, said Williams conveyed to said company 80 acres of land, being the E. ½ of the S. E. ¼ of section 33, township and range aforesaid, the same being a part of the land embraced in said desert-land entry No. 158, and that said company immediately thereafter erected a quartz-mill thereon at an expense exceeding $50,000; that on May 20, 1882, Williams made a written relinquishment of said desert-land entry, and filed the same in said local land-office at Eureka, Nevada, June 9, 1882, and that the same was forwarded by said office to the general land-office at Washington for action thereon; that on May 20, 1882, Williams made an application to the register of the land-office of the state of Nevada to purchase 160 acres of land, being a portion of the land embraced in said desert-land entry, to-wit, the 80 acres of land last above described, and 80 acres adjoining thereto, to-wit, the W. ½ of S. W. ¼ of section 34, township aforesaid, which application was filed in said state land-office, May 22, 1882; that on July 29, 1882, the state of Nevada executed an application of that date for said 160 acres of land; that on August 4, 1882, the commissioner of the general land-office ordered said desert-land entry to be canceled, which order was received at the local land-office at Eureka, Nevada, August 12, 1882, and the same was canceled in said office on that date; that on August 14, 1882, the application of the state of Nevada for said 160 acres of land, based upon Williams' application of May 20, 1882, was received at the United States land-office at Eureka, Nevada, and thereupon the register of said office notified the state authorities that they might include said tract of 160 acres of land in their selection for the month of August, 1882; that on or about September 2, 1882, said state authorities selected a list of lands to be approved to the state, under an act of congress of June 16, 1880, and presented said list to said United States land-office at Eureka, Nevada, September 2, 1882, which list embraced said 160 acres of land aforesaid; that in October, 1882, said list, being list No. 24, under said act of congress, was transmitted to the general land-office, at Washington, and was received at said last-named office about October 12, 1882, and filed therein; that said list No. 24 was not attested by any officer or agent of the state of Nevada until on or about September 12, 1883, and was not so attested when the lands therein listed were erroneously certified to the state, May 3,

1883; that said list of lands so selected by the state was designated as list No. 24, and embraced, with other lands, the two tracts of 80 acres above described; that on May 3, 1883, the secretary of the interior, upon the certificate of the commissioner of the general land-office, approved the lands embraced in said list No. 24 to the state of Nevada, including said two 80-acre tracts of land; that said commissioner certified that said lands embraced in said list No. 24 were open to such selection, and free from conflict with other claims, upon the belief that they were so open to selection and free from conflict: that they were not in fact open to selection by the state, and were not free from conflict with other claims, and that said action of the commissioner was induced either by the fraudulent erasure of records by some person unknown, acting in the interest of Williams, or by reason of the mistake, inadvertence, or misadventure of some officer or employe of complainant.

That the facts and circumstances under which said lands were so certified and approved. and the fraudulent acts or mistake, inadvertence, or misadventure which induced such certification, in addition to those hereinbefore set forth, are as follows: That prior to the filing of said list No. 24, on September 6, 1882, F. O. Matthiessen and L. B. Ward, who had theretofore purchased said 80 acres of land, to-wit, the E. ½ of S. E. ¼ section 33, township 8, range 50 E., by their attorneys, filed in the general land-office at Washington an application for the reinstatement of said desert-land entry No. 158, together with a protest against the selection by the state of said 80 acres contained in said list No. 24, to which they had acquired title, and asking a hearing of their rights, they claiming to have derived an interest in said lands by purchase from Williams, through intermediate parties, who had expended more than $50,000 in the erection of a quartz-mill thereon; that on or about January 8, 1883, said Matthiessen and Ward, being duly qualified in that regard, and being the owners of the quartz-mill and reduction works erected and standing for more than two years prior thereto on said lands, to-wit, the E. ½ of S. E. ¼ section 33, and the W. ¼ of S. W. ¼ section 34, township 8 N., range 50 E., made their application at the United States land-office, at Eureka, Nevada, to enter as a mill-site, and for a patent therefor, five acres of land, being a part of the lands and two tracts last described, and being a part of the land embraced in said desert-land entry No. 158, made by Williams, and including said quartz-mill, reduction works, and improvements connected therewith; that said application was rejected by said local land-office, for the reason that the land applied for for such mill-site was embraced in said state selection embraced in list No. 24, filed in said office, September 2, 1882; that from said decision an appeal was duly taken, the day the same was rendered, to the commissioner of the general land-office, at Washington, and the papers connected therewith were received. by said commissioner, January 18, 1883, and filed in said office, and said mill-site application became and was a pending adverse claim to the claim of the state of Nevada to the said land; that, at the date of the receipt of the receipt of said mill-site application at said general land-office, said list No. 24 was on file in said office, but without action or decision as to any of the tracts of land embraced therein; that, upon the receipt of said application for a mill-site, said commissioner caused a note of conflict to be entered on said list No. 24, opposite to the two said tracts of land in controversy, by writing the words "mill-site" on the margin of said list No. 24; that this was the customary way in said office of denoting an adverse claim to a state selection, and suspended action upon said state selection until said application for a mill-site could be disposed of in the due course of business in such office; that on February 21, 1883, said office denied said application of Matthiessen and Ward to reinstate said desert-land entry No. 158, and in making said decision, in relation to the protest against so much of the state selection as embraced the lands in controversy, said, "The question of the va-

lidity of the state selection will be determined in due course of action thereon by this office;" that said application of Matthiessen and Ward for said mill-site was referred to the proper department of said land-office, with the direction that the same be considered, together with said state selection of said lands embraced in list No. 24; that on May 3, 1883, and while said mill-site application was still pending and undecided, the officers and clerks of the pre-emption division of said land-office, contrary to law, and in disregard of the rules and regulations of said office, and in disregard of the special instructions of the commissioner, proceeded to consider and determine the application of the state of Nevada as evidenced by said list No. 24, and without consideration, examination, decision, or reference to the then pending mill-site application of Matthiessen and Ward, made out a "clear-list," so called, in favor of the state of the tracts of land inuring to the state, embracing therein, by mistake and error, and contrary to the truth, the lands embraced in the mill-site application of Matthiessen and Ward; that the commissioner and secretary of the interior signed said "clear-list," upon the faith of the certificate indorsed thereon, that the lands embraced therein were free from conflict, and upon the' belief that all necessary examinations had been made, and thereby said list became in form a conveyance to the state of Nevada of the several tracts of land embraced therein, including the land embraced in the application of Matthiessen and Ward for a mill-site upon which the quartz-mill, buildings, and other improvements had been placed; that said Matthiessen and Ward were lawfully entitled to have their rights as such applicants for said mill-site passed upon and determined before the legal title to the lands claimed by them should be passed out of the United States to any party claiming adversely to them; that said certification of · said "clear-list" was made by said officers of the land department by mistake, inadvertence, and misadventure, and that said list, at the date thereof, was, and now is, false and fraudulent as to the lands in controversy; that, while said state selection No. 24 was in the general land-office at Washington, it was subject to inspection by parties in the interest of the state, or of Williams, respond-. ent, and their agents and attorneys, and before the same was taken up for action by the commissioner the note and words "mill-site," entered on the margin of said list, were fraudulently erased by some unknown person, with the fraudulent intention of obtaining action upon said selection embraced in said list favorable. to the state, and in aid of the application of Williams to purchase said lands in controversy; that said, lands were so approved to the state by reason of such fraudulent erasure; that in December, 1883, said mill-site application was taken up in the general land-office, together with said state selection of the lands in suit, for action, when it was then first discovered that said land had been approved to the state; that on February 2, 1884, Williams entered into a written contract with the state of Nevada to purchase the lands in controversy, in compliance with his application to purchase the same, of date May 20, 1882; that, immediately upon the discovery of the erroneous certification of said lands, the commissioner of the general land-office, on December 11, 1883, notified the governor of the state of Nevada, by telegraph, that said two tracts of land had been erroneously included in said clear-list, and requested him to cause the same to be returned to said general land-office for correction; that its return was refused, as Williams had made application to purchase the same, and on the fifteenth of December, 1883, said governor was notified that suit would be brought to annul said listing as to the lands in suit; that Williams, prior to entering into contract with the state for the purchase of said lands, had full knowledge of the intention of complainant to annul said listing as to said lands, and entered into said contract with full knowledge of said alleged frauds, and of the false and fraudulent manner by which the same were procured to be certified to

the state; that said lands in controversy were not unappropriated public lands, and not within the terms of the grant of June 16, 1880, but that the same had been occupied as private lands since July 26, 1879, under and by virtue of the deed of conveyance thereof, executed by Williams, of that date, and the same were so occupied when said Williams applied to the state to purchase the same, May 20, 1882, all of which Williams well knew when he applied to purchase the same; that at the date of said Williams' application to purchase said lands of the state he knew they were not subject to selection and purchase, as his desert-land entry No. 158 therefor was still in force and uncanceled, and the same constituted a record appropriation thereof on the books of the local land-office at Eureka, Nevada, and on the books of the general land-office, in Washington.

The answer admits many of the averments of the bill, and denies but few of them. It avers that said lands were free from conflict with other claims at the date of their certification to the state, May 3, 1883; denies that respondent made, or caused to be made, "any erasure of records, fraudulently or otherwise, or had any knowledge of such erasure, until he heard the allegation of such erasure in December, 1883, as emanating from the honorable secretary of the interior, at Washington;" denies that such erasure was a sufficient cause for withholding the certification and approval of said lands to the state, or that it induced such certification, or that, if it had not been made, said list No. 24 would not have been vitiated thereby; avers that the lands in suit were "unappropriated, non-mineral public land," within the meaning of the act of congress of date June 16, 1880; that the application of Matthiessen and Ward, of date January 8, 1883, for a patent for a mill-site, was frivolous, and ought not to be entertained; that the whole subject-matter of the suit is *res adjudicata.*

The evidence submitted fully sustains all of the material allegations of the bill, and it would be a superfluous task to review it in detail.

By act of congress approved June 16, 1880, there was granted to the state of Nevada 2,000,000 of acres of land, in lieu of the sixteenth and thirty-sixth sections of land theretofore granted to said state. 21 St. U. S. 287. Section 2 of said act provides:

"The lands herein granted shall be selected by the state authorities of said state from any unappropriated, non-mineral public land in said state, * * * and, when selected in conformity with the terms of this act, the same shall be duly certified to said state by the commissioner of the general land-office, and approved by the secretary of the interior."

This grant took effect upon its passage. It was a grant *in præsenti,* and attached to specific tracts of land when the same should be selected by the state, and duly certified to it by the commissioner of the general land-office, and approved by the secretary of the interior, as provided by the act.

Under the pleadings and proofs in the case two questions arise:

*First,* was the land in controversy, at the date of selection and listing the same to the state, "unappropriated, non-mineral public land," within the meaning of said act? There is no contention but that it is "non-mineral" land, and this qualification, therefore, need not be considered.

*Second,* was the listing of the land in suit obtained through or by means of the fraudulent acts of any party or parties, or by the inadvertence, mistake, or misadventure of any of the officers of the general land-office, charged with the duty of listing and approving the same to the state?

The evidence shows this state of facts: Some years prior to 1879 the respondent, Williams, entered upon and took possession of the land in controversy, the same being then unsurveyed, public land of the United States. He continued in possession thereof until July 26, 1879, when, in consideration of $5,000 paid to him, he conveyed the land to the New Philadelphia Silver Mining Company, a New York corporation, which company immediately entered into possession of the same, and during the same year erected a quartz-mill thereon at an expense exceeding $50,000. This company continued in possession of the land and mill, and expended a considerable sum of money in conducting water to the mill for reduction purposes and in other improvements. In the year 1880 the company became embarrassed, was sued, judgment recovered against it, and this property sold, in satisfaction thereof, to one Lebbeus Ward, and sheriff's deed therefor was duly issued to Ward, of date July 12, 1881. Proceedings were also instituted against the company about the same time in the supreme court of the state of New York, a receiver was appointed, and the affairs of the company wound up. The receiver was ordered to sell all of the property of the company, and at such sale Matthiessen and Ward became the purchasers of all of the property of the company, and received a deed therefor from said receiver of date September 16, 1881. From the dates of the deeds above mentioned Matthiessen and Ward have been the owners of all the property formerly owned by the New Philadelphia Silver Mining Company, including the mill and land in controversy, water-rights, and privileges, and since said dates have had continuous, peaceable, and quiet possession of the same, and now have and hold such possession as against all persons.

Under this state of facts it cannot be contended, under the repeated decisions of both national and state courts, that this land was "unappropriated public land" at the time of its selection by the state, or at the date when it was listed to the state. *Atherton* v. *Fowler,* 96 U. S. 513; *Hosmer* v. *Wallace,* 97 U. S. 575; *Trenouth* v. *San Francisco,* 100 U. S. 251; *Nickals* v. *Winn,* 17 Nev. 189; *McBrown* v. *Morris,* 59 Cal. 64, and cases cited.

These decisions are authoritative as to what are "public lands," under the pre-emption law, and also what are "unappropriated public lands," under the homestead law. Rev. St. §§ 2258, 2259, 2289.

If, then, the lands in controversy were not "unappropriated public lands," and within the terms of the grant at the date of selection and listing to the state, as they were not, such listing was without authority of law, and was and is void, and no valid title passed thereby. Under the grant in this case, the officers of the general land-office were authorized to pass to the state the title only of "unappropriated public land." It conferred upon them no authority to transfer the title to lands appro-

priated, and lawfully in the possession of others, who had expended large sums thereon, and who were then seeking to obtain the United States title thereto, or a portion thereof, even though such lands were public lands, in the sense that the paramount title thereto still vested in the United States. The date of the application of the state to select these lands, list No. 24, is August 31, 1882, but said application was not attested or authenticated by any officer or agent of the state until about September 12, 1883. The validity of such attestation at said date, September 12, 1883, is not now passed upon, as it is not necessary to a determination of the case.

The rights of persons, situated as Matthiessen and Ward were in reference to these lands, have always been protected by the officers of the land department and by the courts. It may be conceded that they acquired no right as against the United States, but as to third parties they had initiated rights which merited, and should receive, protection. *U. S.* v. *Stone*, 2 Wall. 525; *Hughes* v. *U. S.*, 4 Wall. 232; *Frisbie* v. *Whitney*, 9 Wall. 187.

It is alleged in the bill, not denied, and fully established by the proof, that at the date of listing these lands to the state, and long prior thereto, there was then pending in the general land-office, at Washington, a contest over the application of Matthiessen and Ward for this mill-site, and their protest against the state selection of the lands in controversy. The whole matter was then *sub judice*, in the proper department, in the manner by law provided. While this contest existed, and until determined, the lands in controversy were not within the terms of the grant. *Newhall* v. *Sanger*, 92 U. S. 761. We pass to the second question raised in the case. The allegations of the bill as to the manner in which these lands were listed and approved to the state are in nowise controverted. That the erasure of the record was made, is not denied, and is patent from an inspection of list No. 24, submitted in evidence. The bill avers, and the proof sustains the averment, that, but for this erasure, the lands in controversy would not have been approved to the state; at least not until the rights of Matthiessen and Ward had been determined. A clear, palpable, confessed fraud was perpetrated upon the officers of the land department in procuring the certification of the lands. Frauds of this and like character have always been held sufficient ground for vacating patents procured thereby. In addition to the authorities cited, see *Johnson* v. *Towsley*, 13 Wall. 72; *Moore* v. *Robbins*, 96 U. S. 530, and cases there cited; *U. S.* v. *Minor*, 114 U. S. 234, 5 Sup. Ct. Rep. 836; *U. S.* v. *Curtner*, 26 Fed. Rep. 296; *U. S.* v. *Mullan*, 7 Sawy. 466, 10 Fed. Rep. 785; and 118 U. S. 271, 6 Sup. Ct. Rep. 1041; *Moffatt* v. *U. S.*, 112 U. S. 24, 5 Sup. Ct. Rep. 10.

It is unnecessary to review these authorities, and they cover every point raised in this case. It may be observed that the certificate indorsed upon the clear-list passing the title is qualified, not absolute, and evidently designed to reserve the rights of any parties interested. The list is approved, "subject to any valid interfering rights which may have existed at the date of selection. * * *"

The above considerations dispose of this case upon the merits and law applicable thereto. Upon the grounds that the land in controversy was not "unappropriated public land" at the date of its selection and listing; that its approval and listing to the state was procured by fraud, palpable and undisputed, upon the officers of the land department, without which it would not have been listed to the state; and which frauds deeply affected the rights of third parties in and to the land in suit,—the complainant is entitled to a decree canceling and annulling said listing as to the lands in suit, and as prayed for in the bill.

I am not prepared, from the testimony, to say who was the party that made the fraudulent erasures complained of and shown. They could hardly have been made in the interest of any one other than the respondent. And in this connection we may recall the fact, as shown by the evidence, that the respondent concealed from Matthiessen and Ward, and from their agent in charge of this property, the fact that he had relinquished his desert-land entry No. 158; the fact that he had applied to the state to purchase this very land upon which their mill stands, which he had, three years before, conveyed to their predecessors in interest; his telegraphic dispatch from Washington to Carson, of date December 14, 1883, to Gov. Adams, to execute to him a deed of this land claim "immediately,"—"don't delay." All of these things had but one purpose,—to wrest from Matthiessen and Ward this large property, by covertly obtaining the legal title thereto. This purpose cannot be disguised, and is too obvious for comment.

It should not, for a moment, be supposed that the state, or any of its officers, took any unusual or improper interest in this matter. When the attention of the governor of the state was called to the matter, he very properly declined to issue a state patent for the land, and suggested that legal proceedings be instituted to determine the rights of the parties. It is not probable that the state would ever claim to be the owner of this mill and improvements, even were not the listing annulled as to these lands. It could not afford to acquire property in that manner. A large amount of evidence was submitted on the part of the respondent which is wholly irrelevant to any issue of fact or law raised in this case, and, if considered, cannot in any way affect the judgment which must be rendered upon the facts conceded and proven. This evidence is chiefly in regard to certain contracts entered into between Williams and various parties, but in nowise affecting the merits of this case, or connecting him with Matthiessen and Ward, or establishing any legal relations or obligations between them and himself. This evidence clearly shows that Williams strongly desires to sell to Matthiessen and Ward certain mining claims, he insisting that they are under obligation to purchase the same, and that they, denying such obligation, and doubting the value of the mining claims, just as strongly object to purchasing any of them. Under such circumstances, their position would not seem to be unreasonable. But these rights and obligations, if any there be, between these parties, cannot be settled in this suit. Ample means of redress are open to any of these parties to enforce any legal obligations existing between

them. This suit is in the interest of public right and justice, to correct a public wrong and fraud perpetrated upon a department of the government.

Let a decree be entered for complainant as prayed for in the bill, with costs.