GARRARD v. SILVER PEAK MINES et al.

(Circuit Court, D. Nevada. August 16, 1897.)

No. 617.

1. PUBLIC LANDS—AUTHORITY TO ISSUE PATENT—COLLATERAL ATTACK IN ACTION AT LAW.
   A patent valid on its face may be collaterally attacked in an action at law, and shown to be void by extrinsic evidence which by its nature is capable of showing a want of authority to issue the patent or convey the title.

2. SAME—PATENT FOR LAND RESERVED OR DEDICATED—OPEN TO CHALLENGE.
   Where by act of congress a tract of land has been reserved from entry, or dedicated to any special purpose, proceedings in the land department to procure title thereto in defiance of such reservation or dedication, though culminating in a patent, confer no title, and may be challenged in an action at law.

3. SAME—GRANT TO STATE—SELECTION OF RESERVED LANDS—PATENT BY STATE.
   The selection of a tract of either mineral or occupied lands by the state of Nevada, under the grant to the state by the United States of 2.000,000 acres of unappropriated nonmineral lands, to be selected by the state, is void, and a patent issued by the state for such tract confers no title on the patentee.

4. SAME—PATENT FOR MILL SITE—MISTAKE IN DESCRIPTION — RIGHTS OF PATENTEE.
   A patentee of a mill site, on which he had erected a quartz mill, and who continues to occupy the site, and makes other valuable improvements. but by reason of a mistake in the survey the description in the patent does not cover the land occupied, has at least an equitable title that will prevail against one who, with notice, attempts to acquire the legal title.

5. SAME—DESCRIPTION IN CONVEYANCE—FIXED, VISIBLE MONUMENTS—STARTING POINT.
   In determining the location of premises by the description in a conveyance, a fixed, visible monument can never be rejected as false or mistaken. in favor of mere course and distance, as the starting point, when there is nothing else in the terms of the grant to control and override the fixed and visible call.

6. SAME—LOCATION OF SALINE LAND—FAILURE TO RECORD SURVEY IN TIME.
   A location of saline land, and the recording of the survey in accordance with the provision of the statute, though not within the time specified, is valid and sufficient against one who attempts to acquire an adverse title more than 20 years after the field notes were recorded.

7. Same—Extent of Claim—Evidence of Occupancy—Saline and Mineral Lands.

The actual possession of the entire tract claimed by occupancy under a mining or saline location need not be indicated by fence or other inclosure as in the case of agricultural lands, compliance with the statutes as to record and notice, and the actual occupancy of a part of the premises, being sufficient.

This is an action in ejectment to recover of and from the defendant the Silver Peak Mines the following lands, situate in Esmeralda county, Nev., to wit: "The north-east quarter of the north-east quarter of section twenty-two (22) in township two (2) south, range thirty-nine (39) east, Mt. Diablo base and meridian, containing forty acres."

The complaint, among other things, alleges that in and upon said lands were and are valuable mill tailings and slimes, containing gold, silver, and other metals; that defendants ever since June, 1895, have been, and now are, engaged in making excavations and openings in said land, and removing and converting to their own use large quantities of said tailings and deposits, containing gold and silver of the value of $6,000, to the damage of plaintiff in said sum. The answer of the defendant Silver Peak Mines, after denying all the allegations of the complaint, except as to there being upon said land valuable tailings and slimes, containing gold and silver and other metals, alleges as a defense to said action: That in the year 1865 the predecessors in interest and grantors of this defendant, under and by virtue of an act of the legislature of the state of Nevada entitled "An act to provide for the location of lands containing salt," did locate and have surveyed under and by virtue of the possessory act of the said state a tract of land and mill site and water right in the Silver Peak and Red Mountain mining district, Esmeralda county, state of Nevada, described as follows: "Beginning at a post and mound situated about south, 60° west. 24 chains, from the Great Salt Basin mill, and runs thence, first, N., 19° 30′ E., 45.71 chains, to a post and mound; thence, second, south, 70° and 30′ E., 35 chains, to a post and mound; thence, third, south, 19° and 30′ W., 45.71 chains, to a post and mound; thence, fourth, north, 70° and 30′ W., 35 chains, to the place of beginning,—containing 160 acres." That said land was upon the unsurveyed and unappropriated public domain of the United States. That in the years 1865, 1866, and 1867 the grantors and predecessors in interest of defendant caused to be erected and constructed on said land a mill site and water right and quartz mill costing the sum of $70,000. That, after the construction and completion of the said quartz mill, such steps were taken and acts done as required by the several acts of congress and the rules and regulations and instructions of the general land office and secretary of the interior in relation to the locating and patenting of mill sites. That on the 1st day of May, 1879, the government of the United States issued to the grantors and predecessors in interest of the defendant the Silver Peak Mines a patent for 4.97 acres as a mill site, upon which land the said quartz mill was then constructed. That since 1865 this defendant, and those from whom it has derived its title, has been, and now is, in the quiet, peaceable, and undisturbed possession of said 160 acres of land, and of the said patented ground. That since the year 1865 this defendant, through its predecessors in interest and grantors, has been, and now is, a bona fide settler and occupant of the land and premises described in plaintiff's complaint, and the whole thereof. That its grantors and itself have made valuable improvements thereon. That said settlement was made and improvements constructed long prior to any selection of said land or claim of ownership by the plaintiff or his grantor. That the plaintiff and his grantor were well aware at the date of the selection of the said land that this defendant and its grantors were, and had been for a great number of years, in the open, notorious, and exclusive possession of all of said land, claiming ownership of the same. That, prior to the time of the alleged selection and claim of ownership of the land and premises on the part of the plaintiff, there was regularly located upon said ground a mining claim known

as the "Manser Mining Claim," 1,500 feet in length by 600 feet in width, of which this defendant is in the quiet, peaceable and undisturbed possession, and is the owner thereof. That the said plaintiff and his grantor in the procuring of the said pretended title and claim of ownership well knew that the same was procured by fraud and false representations, which said fraud and misrepresentations consist of the following facts: "That the pretended title to the said land was procured by the plaintiff and one Alexander Morrison, his grantor, through and from the state of Nevada; and the said state of Nevada derived its right to receive applications for the sale of land within the territorial limits of said state under and by virtue of an act of congress donating lands to the several states and territories, and the several acts amendatory thereof and supplemental thereto, in which said acts of congress it is expressly provided that 'the lands hereby granted shall be selected by the state authorities of said state from any unappropriated, non-mineral, public land in said state, in quantities not less than the smallest legal subdivision'; but notwithstanding the said A. Garrard, the plaintiff, and the said Alexander Morrison, his grantor, well knew that this defendant, the Silver Peak Mines, was, and had been for a long time prior to the date of making the application to purchase the land described in the complaint, in the quiet, peaceable, and undisturbed occupancy of the said land, and every part thereof, and well knowing that this defendant, the Silver Peak Mines, and its grantors and predecessors in interest, had caused to be erected on said land valuable, prominent, and permanent improvements, at a cost of one hundred thousand dollars or thereabouts, and said plaintiff and his grantor well knowing that the said land was mineral in character, containing gold, silver, and other precious metals, and also salt and saline, and that the said land was not fit for grazing or agricultural purposes, notwithstanding that all of the above facts were within the personal knowledge of the plaintiff and his grantor, they and each of them falsely and fraudulently misrepresented and misstated the facts to the surveyor general and ex officio land register of the state of Nevada, and by such false and fraudulent acts and misrepresentations induced the said surveyor general, as ex officio land register of the state of Nevada, to believe that the said land was unoccupied and nonmineral in character, and he, the said surveyor general, as ex officio land register, so believing from the said statements as aforesaid, was induced to select the land described in the complaint as a part of the lands granted by the acts of congress, * * * when in truth and in fact the said land was not of the class of land granted or included within the spirit or terms of the said act of congress, but, upon the contrary, were and are expressly excluded therefrom by reason of its being occupied, appropriated, and mineral, and not public, and was not open to selection by the said state of Nevada, and by reason of the said false and fraudulent misrepresentations as hereinbefore mentioned, and the selection of the said land by the state of Nevada, through its surveyor general, as ex officio land register, a fraud has been perpetrated against the government of the United States of America, and against this defendant, the Silver Peak Mines."

The case was tried before the court without a jury. The evidence on behalf of the defendant shows: That in 1865 the Great Salt Basin Mill & Mining Company located, under the possessory laws of the state, 160 acres of unsurveyed and unappropriated public land, including the 40-acre tract in controversy, and caused the same to be surveyed, and the boundaries thereof marked by posts and mounds, and the field notes of the survey, with the diagram of the location and survey, were recorded in the county recorder's office of Esmeralda county. That during that year Samuel B. Martin, John W. Harker, and Maj. Raymond constructed a 10-stamp quartz mill upon said land, which mill was then known as, and commonly called, the "Great Salt Basin Gold & Silver Mining Company's Quartz Mill." That in February, 1866, this mill was closed down, and the property was left in charge of the secretary of the company. That in the spring of 1866 the company dug a ditch around three sides of the 160-acre tract of land. That in the fall of that year Samuel B. Martin caused to be graded a foundation for a new quartz mill, and during the year 1867 was engaged building a mill which was completed in 1868, and the company commenced crushing ore, and continued working until the fall of 1870. This mill was known and designated as the "Silver Peak & Red Mountain Gold &

Silver Mining Company's Quartz Mill." That this mill is still on the same land, and is substantially in the same condition as it was at the time of completion. That some of the machinery has been replaced, and a building added thereto, to be used as a cyanide plant. That this land, including the new mill and other property, was conveyed by Samuel B. Martin and John W. Harker to the Silver Peak & Red Mountain Gold & Silver Mining Company in November, 1866, and a confirmatory deed executed in 1869. That in 1877 the Silver Peak & Red Mountain Gold & Silver Mining Company applied for a patent for a mill site. That on May 1, 1879, a patent was issued to it for said mill site, being mineral entry No. 184, designated by the surveyor general as lots Nos. 37A and 37B, embracing a portion of the unsurveyed public domain in the Silver Peak mining district, in the county of Esmeralda, described in the patent as follows: "Beginning for the description of that portion of the premises designated as lot No. 37B at a post marked 'No. 1, U. S. Survey No. 37, Lot B,' from which post No. 1 of U. S. survey No. 37, lot A, hereinbefore described, bears south, eighty-four (84) degrees west, at the distance of eighty-five hundred and fifty-eight (8,558) feet, the north corner of said company's mill on this claim bears south, two (2) degrees thirty (30) minutes west, at the distance of one hundred and sixty-five (165) feet, and the southeast corner of the stone office bears north, eight (8) degrees west, at the distance of four hundred and ninety (490) feet; thence from said corner No. 1 south, forty-five (45) degrees east, seven hundred and twenty-two (722) feet, to corner No. 2, a post marked, 'No. 2, U. S. survey No. 37B;' thence south, forty-five (45) degrees west, three hundred (300) feet, to corner No. 3, a post marked, 'No. 3, U. S. Survey No. 37B;' thence north, forty-five (45) degrees west, seven hundred and twenty-two (722) feet, to corner No. 4, a post marked, 'No. 4, U. S. Survey No. 37B;' thence north, forty-five (45) degrees east, three hundred (300) feet, to the place of beginning,—containing four (4) acres and ninety-seven hundredths ($^{97}/_{100}$) of an acre of land, more or less." That the Silver Peak & Red Mountain Gold & Silver Mining Company afterwards became bankrupt, and proceedings in bankruptcy were thereafter instituted in the district court of the Southern district of New York, where said corporation was organized, and Andrew C. Armstrong was duly appointed assignee of the bankrupt's estate. That Armstrong, as such assignee, on June 13, 1877, conveyed the land in controversy in this action, with other property, to Charles E. Vail, who, with his wife, conveyed the same to the defendant herein January 8, 1878. That the property of the bankrupt corporation, including the land in question in this action, was also sold at sheriff's sale, under an execution issued out of this court in the suit of Blair v. The Silver Peak & Red Mountain Gold & Silver Mining Co., to John D. Vail, on February 5, 1878. That the said John D. Vail and his wife on September 13, 1879, conveyed the same, by deed, to the defendant herein. That this defendant has been ever since in the actual, quiet, peaceable, and undisturbed possession thereof, and it, and those through whom it claims and derives title, caused to be constructed on said land and premises prominent and permanent improvements, consisting of a 30-stamp quartz mill, concrete houses, assay office, blacksmith shop, store houses, buildings, and corrals, at an expense of $50,000. That the 40-acre tract purchased by Morrison is not agricultural land. That over one-half thereof, and all that is covered with the tailings and slimes, is known to be saline land, and was so known at the time that Morrison made application to purchase the same. That in June, 1888, the Manser mining claim was located, and in June, 1889, conveyed to defendant, said claim being upon the land in question.

The act to provide for the location of lands containing salt, approved February 24, 1865, reads as follows:

"346. Section 1. Any person may locate, claim, and hold not exceeding one hundred and sixty acres of the public lands within this state containing salt or saline matter.

"347. Sec. 2. It shall be the duty of any person or persons locating salt lands to have the same surveyed by the county surveyor of the county in which said lands are located, within thirty days from the date of location; and the surveyor shall, within thirty days from the completion of said survey, make and deliver to the party employing him to make the survey, a correct description and plat of the lands thus surveyed, and the same shall be recorded in the office

of the county recorder of said county within thirty days from the delivery thereof by the surveyor.

"348. Sec. 3. All locations made prior to the passage of this act upon saline lands are hereby ratified and confirmed to the locators thereof, their heirs and assigns; provided, the parties now holding and occupying said lands shall, within sixty days from the passage of this act, have the same surveyed and recorded as provided in section two of this act." Gen. St. Nev. §§ 346-348.

The land in question is a part of the 2,000,000 acres of land granted by the act of congress to the state of Nevada in lieu of the sixteenth and thirty-sixth sections in said state, approved June 16, 1880 (21 Stat. 287). This act provides as follows:

"Sec. 2. The lands herein granted shall be selected by the state authorities of said state from any unappropriated, non-mineral, public land in said state in quantities not less than the smallest legal subdivision; and when selected in conformity with the terms of this act the same shall be duly certified to said state by the commissioner of the general land office and approved by the secretary of the interior.

"Sec. 3. The lands herein granted shall be disposed of under such laws, rules and regulations as may be prescribed by the legislature of the state of Nevada."

On March 12, 1885, the legislature of Nevada passed "An act to provide for the selection and sale of lands that have been or may hereafter be granted by the United States to the state of Nevada." Gen. St. 1885, p. 97. Section 14 of this act provides that "all lands selected under the two million acre grant of June 16, 1880, may be sold in tracts equal to one section to each applicant. * * * No lands shall be sold in tracts less than the smallest legal subdivision." On March 3, 1887, the legislature passed "An act to encourage mining" (St. 1887, p. 102), declaring that the grants of land by the United States to the state reserved mineral lands; that sales of such lands were made subject to such reservation; that citizens "may enter upon any mineral lands in this state notwithstanding the state's selection," and explore for mineral, and obtain title thereto under the laws of the United States, "notwithstanding such selection"; and that every contract, patent, or deed hereafter made by the state shall contain a provision "expressly reserving all mineral lands," etc. On March 5, 1887, the legislature passed "An act defining the rights of applicants for and contractors to purchase land from the state of Nevada and providing for maintaining certain actions concerning such lands" (St. 1887, p. 124), declaring that purchasers of land from the state shall be deemed to have the right to the exclusive possession thereof, "provided no actual adverse possession thereof existed in another at the date of the application"; that such purchaser "shall be entitled to maintain or defend any action at law or in equity concerning said land or its possession * * * provided no actual adverse possession of such land existed in another at the date of such application."

The patent was issued to Morrison "according to the provisions of an act of the legislature approved March 12, 1885, entitled 'An act to provide for the selection and sale of lands that have been or may hereafter be granted by the United States to the state of Nevada' and the acts amendatory thereof and supplementary thereto"; and the land specified was granted subject to the proviso "that all mines of gold, silver, copper, lead, cinnabar, and other valuable minerals that may exist in said tract are hereby expressly reserved."

Reddy, Campbell & Metson, for plaintiff.

Rush Taggart, Clarence W. Mitchell, and M. A. Murphy, for defendants.

HAWLEY, District Judge (orally). 1. The plaintiff's title to the land described in the complaint rests upon the validity of the patent from the state of Nevada to Alexander Morrison, dated May 22, 1891, and the deed from Morrison to the plaintiff, executed June 29, 1891. The defendant introduced testimony tending to support the various allegations of its answer, which, if admissible, was

claimed to be sufficient to invalidate the plaintiff's patent, and entitle it to the judgment. This testimony was admitted for the consideration of the court, subject to the objections of plaintiff. The contention of plaintiff is that all the testimony which tended to invalidate the patent was inadmissible; that in an action at law a patent cannot be collaterally attacked. This general rule is well settled, but there are also certain exceptions to the general rule that are as well settled as the rule itself. The difficult question to determine is whether the case comes within the general rule, or belongs to the class of cases which are excepted from the rule. A vast number of authorities have been cited by the respective counsel, all of which have been carefully examined, as well as many others which shed more or less light upon this subject. There is a clear distinction between the two lines of cases, although it is not always easy to ascertain from the particular facts within which line the case falls. In Doolan v. Carr, 125 U. S. 618, 624, 8 Sup. Ct. 1231, the court, in discussing this question, said:

"There is no question as to the principle that where the officers of the government have issued a patent in due form of law, which on its face is sufficient to convey the title to the land described in it, such patent is to be treated as valid in actions at law, as distinguished from suits in equity, subject, however, at all times to the inquiry whether such officers had the lawful authority to make a conveyance of the title. But if those officers acted without authority, if the land which they purported to convey had never been within their control, or had been withdrawn from that control at the time they undertook to exercise such authority, then their act was void,—void for want of power in them to act on the subject-matter of the patent, not merely voidable, in which latter case, if the circumstances justified such a decree, a direct proceeding, with proper averments and evidence, would be required to establish that it was voidable, and should therefore be avoided. The distinction is a manifest one, although the circumstances that enter into it are not always easily defined. It is nevertheless a clear distinction, established by law, and it has been often asserted in this court, that even a patent from the government of the United States, issued with all the forms of law, may be shown to be void by extrinsic evidence, if it be such evidence as by its nature is capable of showing a want of authority for its issue. The decisions of this court on this subject are so full and decisive that a reference to a few of them is all that is necessary: Polk v. Wendall, 9 Cranch, 87; New Orleans v. U. S., 10 Pet. 662, 730; Wilcox v. Jackson, 13 Pet. 498; Stoddard v. Chambers, 2 How. 284, 317; Easton v. Salisbury, 21 How. 426, 428; Reichart v. Felps, 6 Wall. 160; Best v. Polk, 18 Wall. 112, 117; Leavenworth Railroad v. U. S., 92 U. S. 733; Newhall v. Sanger, 92 U. S. 761; Sherman v. Buick, 93 U. S. 209; Smelting Co. v. Kemp, 104 U. S. 636; Steel v. Refining Co., 106 U. S. 447, 1 Sup. Ct. 389; Railway Co. v. Dunmeyer, 113 U. S. 629, 642, 5 Sup. Ct. 566; Reynolds v. Mining Co., 116 U. S. 687, 6 Sup. Ct. 601."

In Burfenning v. Railroad Co., 163 U. S. 321, 323, 16 Sup. Ct. 1019, the court said:

"It has undoubtedly been affirmed over and over again that, in the administration of the public-land system of the United States, questions of fact are for the consideration and judgment of the land department, and that its judgment thereon is final. Whether, for instance, a certain tract is swamp land or not, saline land or not, mineral land or not, presents a question of fact not resting on record, dependent on oral testimony; and it cannot be doubted that the decision of the land department, one way or the other, in reference to these questions is conclusive, and not open to relitigation in the courts, except in those cases of fraud, etc., which permit any determination to be re-examined. Johnson v. Towsley, 13 Wall. 72; Smelting Co. v. Kemp, 104 U. S. 636; Steel

v. Refining Co., 106 U. S. 447, 1 Sup. Ct. 389; Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. 985; Heath v. Wallace, 138 U. S. 573, 11 Sup. Ct. 380; McCormick v. Hayes, 159 U. S. 332, 16 Sup. Ct. 37. But it is also equally true that when by act of congress a tract of land has been reserved from homestead and pre-emption, or dedicated to any special purpose, proceedings in the land department in defiance of such reservation or dedication, although culminating in a patent, transfer no title, and may be challenged in an action at law. In other words, the action of the land department cannot override the expressed will of congress, or convey away public lands in disregard or defiance thereof. Smelting Co. v. Kemp, 104 U. S. 636, 646; Wright v. Roseberry, 121 U. S. 488, 519, 7 Sup. Ct. 985; Doolan v. Carr, 125 U. S. 618, 8 Sup. Ct. 1228; Davis' Adm'r v. Weibbold, 139 U. S. 507, 529, 11 Sup. Ct. 628; Knight v. Association, 142 U. S. 161, 12 Sup. Ct. 258."

These cases sufficiently indicate, in general terms, the line of distinction which should always be observed and followed by the courts; the question being always dependent upon the peculiar facts of each particular case. I have had occasion in numerous cases, under a great variety of facts, to consider the question in many of its different phases, and to make the application under the rules above stated. Heydenfeldt v. Mining Co., 10 Nev. 290, 308, affirmed 93 U. S. 634; Rose v. Mining Co., 17 Nev. 25, 64, 27 Pac. 1105, affirmed 114 U. S. 576, 581, 5 Sup. Ct. 1055; Whitney v. Taylor, 45 Fed. 616, affirmed 158 U. S. 85, 88, 15 Sup. Ct. 796; Lakin v. Dolly, 53 Fed. 333, 336, affirmed 4 C. C. A. 438, 54 Fed. 461.

2. Was the 40-acre tract selected by Morrison, at the time the selection was made, unappropriated, nonmineral, public land? If it were, the state had no authority, under the law, to issue a patent therefor. The evidence shows that prior to the selection of this land by Morrison the government of the United States had issued a patent to the defendant's grantors for 4.97 acres as a mill site; and the defendant, at the time of the selection of the 40-acre tract and the issuance of the patent to Morrison by the state, and at the time of plaintiff's purchase, was in the actual possession of the mill site, and had erected thereon a 30-stamp quartz mill, and made other valuable improvements thereon. These facts were well known by the plaintiff at the time he procured the deed from Morrison. He relies, however, upon a mistake in one of the courses described in the United States patent, which, literally followed, without reference to the buildings and monuments mentioned in the patent, would place the land for the mill site in section 15 instead of in section 22; but, if you take the buildings and monuments referred to in the patent as found upon the ground, the land for the mill site described in the United States patent is in section 22, upon the land claimed by plaintiff. This is made absolutely clear by the testimony of Mr. L. F. J. Wrinkle, a surveyor called by the plaintiff, who, after describing certain surveys made by him, testified as follows:

"If you will allow me to explain, I will explain, to my mind, at least. The question was presented to me whether this mill site lies, according to the calls of the patent and other United States maps, in section 15 or section 22. Now, if you take the call of the patent in connection with the United States map alone, it will place it in section 15; but if you go upon the ground, and supplement the knowledge in the patent, or rather, substitute what you get in the patent by knowledge you acquire on the ground, it will place it in section 22."

The law is well settled that courses and distances must always yield to natural and well-defined and easily ascertained objects and monuments. The general principle is clearly expressed in Tyler, Ej. 569:

"What is most material and most certain in a description shall prevail over that which is less material and less certain. Thus, course and distance shall yield to natural and ascertained objects, as a river, a stream, a spring, or a marked tree. Indeed, it seems to be a universal rule that course and distance yield to natural, visible, and ascertained objects. Newsom v. Pryor's Lessee, 7 Wheat. 10; Preston v. Bowmar, 6 Wheat. 582; Jackson v. Camp, 1 Cow. 605; Doe v. Thompson, 5 Cow. 371; Jackson v. Moore, 6 Cow. 706. And a false or mistaken particular in a conveyance may be rejected when there are definite and certain particulars sufficient to locate the grant. But, prima facie, a fixed, visible monument can never be rejected as false or mistaken, in favor of mere course and distance, as the starting point, when there is nothing else in the terms of the grant to control and override the fixed and visible call. The general rule that courses and distances must yield to natural or artificial monuments or objects is upon the legal presumption that all grants and conveyances are made with reference to an actual view of the premises by the parties thereto. Raynor v. Timerson, 46 Barb. 518."

See, also, Book v. Mining Co., 58 Fed. 106, 115; Higueras v. U. S., 5 Wall. 827, 835; Adair v. White, 85 Cal. 313, 24 Pac. 663; Anderson v. Richardson, 92 Cal. 623, 28 Pac. 679; Stoll v. Beecher, 94 Cal. 1, 29 Pac. 327; Kanne v. Otty, 25 Or. 531, 36 Pac. 537; Robinson v. Laurer, 27 Or. 315, 40 Pac. 1012; Greer v. Squire, 9 Wash. 359, 37 Pac. 545; Richwine v. Jones, 140 Ind. 289, 39 N. E. 460; McCullough v. Improvement Co., 48 N. J. Eq. 170, 21 Atl. 481; Thompson v. Harris, 40 Neb. 230, 58 N. W. 712; Peterson v. Skjelver, 43 Neb. 663, 666, 62 N. W. 43; Pitman v. Nunnelly (Ky.) 32 S. W. 606.

The mistake in the present case was not of such a character as could be taken advantage of by the plaintiff or his grantor. There was no mistake in making the survey of the mill site. There was simply a clerical mistake made in the entry of the United States deputy mineral surveyor in his field notes as to one course,—84° west; but the north corner of the mill site, and the southeast corner of the stone office, and the place where post 1 of the survey is found and designated in the field notes and other reference in the patent, show very clearly what land was really included in the mill site, viz. the land upon which the company's mill was then situated, in section 22. In Washington & I. R. Co. v. Cœur D'Alene Ry. & Nav. Co., 160 U. S. 77, 96, 16 Sup. Ct. 231, there was a controversy between two railroad companies over a right of way claimed by both companies. It appears that the Cœur D'Alene Company made a survey of three different lines as to the route of its road; that on the 9th day of November, 1886, ten days after the completion of the survey of the three lines, A, B, and C, the company filed in the United States land office a map and profile, which were, on December 3, 1886, approved by the secretary of the interior, and that on this map the line B, through the town of Wallace, in Idaho, was platted as the line of the said railroad; that in the fall of 1877 the company constructed its railroad upon line C, and across the land in controversy, but no amendment of the said map was made, nor was any approval of the secretary of the interior obtained to any map covering line C. After comment-

ing upon the facts as to the filing of the map of one route, and the building of the route and station on another, the court said:

"If the United States could not and do not complain, there is no foundation for the plaintiff company to do so, as it was found by the trial court that the platting of line B instead of line C was through a mistake, and that such mistake was not discovered until after the completion of the defendant's railroad and depot over and upon the ground in controversy, and that the filing of the plat showing line B was not done for the purpose of in any manner deceiving the plaintiff or any one else, and that the plaintiff was not in any manner misled or prejudiced by the filing of said plat, or by said mistake."

And at the close of the opinion the court said:

"When a court of law is construing an instrument, whether a public law or a private contract, it is legitimate, if two constructions are fairly possible, to adopt that one which equity would favor."

Admitting that the defendant's grantors are responsible for the acts of the surveyor, it cannot be claimed that they lost or forfeited any of their rights by a mistake which injured no other party. Watson v. Robey, 9 Cal. 52. The defendant has at least an equitable title, under its patent obtained from the United States, to the land and mill site in section 22, even if the land was misdescribed in the original application. This equitable title can be enforced as against any one who afterwards, with full knowledge of all the facts, obtained the legal title from the state. The holder of a legal title in bad faith must always yield to a superior equity. Sensenderfer v. Kemp, 83 Mo. 581; Hedrick v. Beeler (Mo. Sup.) 19 S. W. 492; Widdicombe v. Childers, 124 U. S. 400, 404, 8 Sup. Ct. 517. In the case last cited the defendants claimed title under one Smith, who applied at a public land office for the S. E. ¼ section of land, but by a mistake the register described it as the S. W. ¼. Many years afterwards, Widdicombe, with knowledge of the mistake, obtained a patent from the United States for the S. E. ¼ section. The court said:

"The mistake in this case does not appear to have been discovered by Smith, or those claiming under him, until after Widdicombe had got his patent, and after they had been in the undisputed enjoyment for thirty-five years and more of what they supposed was their own property, under a completed purchase, with the price fully paid. Widdicombe, being a purchaser with full knowledge of their rights, was in law a purchaser in bad faith; and, as their equities were superior to his, they were enforceable against him, even though he had secured a patent vesting the legal title in himself."

See, also, Godkin v. Cohn, 25 C. C. A. 557, 80 Fed. 458, 464.

Apply these principles to the facts of the case at bar. The company's mill mentioned in the patent was in section 22. There was no mill in section 15. When the entire description and references contained in the United States patent are considered, any person going upon the ground would at once discover where the land mentioned in the patent was, and that a mistake had been made in one of the courses given by the surveyor. This is as clear as the noonday sun when it shines, although it was obscured at the trial by the testimony of witnesses, by ingenious questions asked by counsel. The plaintiff, a surveyor by profession, knew it. He knew that the mill mentioned in the patent was in section 22, and was also aware that by literally following the field notes of the United States surveyor a sur-

vey could be made that would not include the mill. He sought, and now seeks, to take advantage of this mistake, and objects to the consideration of any and all testimony which tends to establish the truth, upon the ground that if the truth be ascertained, and effect given to it by the court, his title under the state patent will be invalidated. "My patent," he asserts, "cannot be collaterally attacked in an action at law." But why not? Is it not always permissible in any case at law or in equity to show that a patent upon which either party relies was issued without authority of law? In Polk v. Wendall, 9 Cranch, 87, 99, the court said:

"But there are some things so essential to the validity of the contract that the great principles of justice and of law would be violated, did there not exist some tribunal to which an injured party might appeal, and in which the means by which an elder title was acquired might be examined. * * * But there are cases in which a grant is absolutely void, as where the state has no title to the thing granted, or where an officer had no authority to issue the grant. In such cases the validity of the grant is necessarily examinable at law."

In Patterson v. Winn, 11 Wheat. 380, 384, the court, after reviewing previous decisions, said:

"We may therefore assume, as the settled doctrine of this court, that if a patent is absolutely void upon its face, or the issuing thereof was without authority, or was prohibited by statute, or the state had no title, it may be impeached collaterally in a court of law, in an action of ejectment."

In Rose v. Mining Co., supra, speaking for the supreme court of this state, I said:

"In cases where a patent is issued without authority of law, there is no necessity to resort to a court of equity to have it declared void. The question of its invalidity can be raised and determined in any proceeding either in law or equity. The authority of the court to declare the St. George and Victoria patents void, under the pleadings in this action, is too well settled to require discussion."

And in this case, upon the evidence introduced by the defendant, the same conclusion is reached as to plaintiff's patent. All the presumptions in favor of the patent are fully met and overcome by the proofs, which are, under the authorities, held to be admissible in actions at law as well as in suits in equity, as will more fully appear hereafter in the discussion as to the specific facts of this case. In the present case the plaintiff's patent is not absolutely void upon its face, but the testimony offered by defendant tends to show, and does show, that it was issued without authority, that it was prohibited by the statute of this state, and that the state had no title to the land conveyed. In all such cases the patent may be impeached collaterally in a court of law.

3. The 2,000,000-acre grant by the United States to the state of Nevada was not intended to include any mineral lands. Hermocilla v. Hubbell, 89 Cal. 5, 26 Pac. 611; Heydenfeldt v. Mining Co., supra. It has been the universal policy of the general government to exclude such lands from its grants. Saline lands are mineral, and were therefore reserved from the grant to the state. In re Eagle Salt Works, Copp's U. S. Mineral Lands, 324; Hall v. Litchfield, Id. 321; Morton v. Nebraska, 21 Wall. 660, 667; Milling Co. v. Clay (Ariz.) 29 Pac. 9. The land upon which the slimes and tailings are

situated being salt or saline lands, it follows that the state acquired no title thereto, because such lands were exempted from the grant. The same principle applies to the ground included in the location of the Manser mine. The state authorities were to select the land granted "from any unappropriated, nonmineral, public land." They were not invested with the duty of passing upon the question of fact as to whether or not each particular section of land was nonmineral or unappropriated; nor was this duty imposed upon the commissioner of the general land office when he certified to the selection, or upon the secretary of the interior when he approved the same, to the same extent as in cases of applications made by individuals or corporations for a patent to agricultural or mineral lands, where specific proofs are required, and the land department is clothed with the power to hear and determine all questions as to the character of the land, the right of the applicant to apply for and receive the same, and the sufficiency of the proofs to show a compliance with the law entitling the applicant to a patent. All of these acts upon the part of the officers were subject to the reservations specified in the act itself. This is true of the grants made by the government to the railroad companies, and all other grants of similar character. In Mining Co. v. Consolidated Min. Co., 102 U. S. 167, 174, the court, upon this subject, said:

"Taking into consideration what is well known to have been the hesitation and difficulty in the minds of congressmen in dealing with these mineral lands, the manner in which the question was suddenly forced upon them, the uniform reservation of them from survey, from sale, from pre-emption, and above all from grants, whether for railroads, public buildings, or other purposes, and looking to the fact that from all the grants made in this act they are reserved, one of which is for school purposes besides the sixteenth and thirty-sixth sections, we are forced to the conclusion that congress did not intend to depart from its uniform policy in this respect in the grant of those sections to the state. It follows from the finding of the court and the undisputed facts of the case that the land in controversy, being mineral land, and well known to be so when the surveys of it were made, did not pass to the state under the school-section grant."

In Morton v. Nebraska, supra, the court, after declaring that it had been the general policy of the government to reserve saline lands from its grants, and that the section of the act under consideration should be construed in conformity with this policy, said:

"The language of the section is imperative, and leaves no room for construction. Besides, why should an intention be imputed to congress to exclude actual settlers from saline lands, but leave them open to private entry by speculators? The legislation upon the subject of public lands has always favored the actual settlers, but the construction contended for would discriminate against them, and in favor of a class of people whose interests congress has never been swift to promote. * * * It does not strengthen the case of the plaintiffs that they obtained certificates of entry, and that patents were subsequently issued on these certificates. It has been repeatedly decided by this court that patents for lands which have been previously granted, reserved from sale, or appropriated, are void. The executive officers had no authority to issue a patent for the lands in controversy, because they were not subject to entry, having been previously reserved, and this want of power may be proved by a defendant in an action at law."

In Hermocilla v. Hubbell, supra, which was an action of ejectment, the plaintiff claimed title under a patent from the state; the

state having acquired whatever right it had from a grant from the general government of sections 16 and 36 for school purposes. The defendants, after denying plaintiff's title, averred that they were the owners of certain mining ground situate on the land claimed by plaintiff. The court, after declaring that the title to mineral lands did not pass by the grant to the state, among other things, said:

"It is also claimed that the defendants were not in a position to attack the patent. But, as we have seen, the state had no title to the mineral land, and passed none to its patentee. The title still remained in the general government, and under its laws the land was open to occupation and purchase as mineral land. The defendants were in possession of their claims under locations which were made in accordance with the law and the local rules and customs. They were therefore in privity with the United States, and had a clear right to contest the patent and assert their rights."

If it could possibly be held that the title of the government to the mineral land passed to the state, it would not benefit the plaintiff; for it has always been the policy of this state, as expressed in the various acts to which reference has already been made, to exclude the mineral lands from sale. The state has no authority whatever to issue a patent for any mineral land. Heydenfeldt v. Mining Co., supra.

4. There is still another branch of this case, which leads with equal certainty to the same conclusive results. Take the facts in relation to the 160 acres of land, the improvements made thereon, the change of title, the possession of the parties, and the actual occupancy of the land by the defendant under a claim of title, and we are forced to the conclusion that the land in controversy was at the time of its selection by Morrison and the issuance to him of the patent by the state, and of the purchase by plaintiff, in the actual, adverse possession of another, which, under the provisions contained in sections 1 and 2 of the act approved March 5, 1887, is of itself sufficient to prevent the plaintiff from maintaining this action. In this connection it must be remembered that the selection of the land is made by the applicant at his own peril, and he cannot shield himself from his own error or fault by showing that his selection was approved by the proper state officers. It must also be borne in mind that neither the plaintiff nor his grantor was ever in the possession of any part or portion of the land. He has no title, interest, claim, or right to the land, or to the possession thereof, except such as is derived from and through the patent from the state. He must recover, if at all, upon the strength of his own patent, and cannot rely upon the weakness of his adversary's title. The legislature of this state, guided by the sound policy so long adopted and universally followed by the general government, and, in the exercise of its own wisdom and good faith to the citizens of this state, early had in view the local conditions with reference to the unsurveyed lands, and the difficulties under which the early settlers were prevented from acquiring any title, either from the state or national government, and the lapse of time that might occur before such titles could be obtained, fostered, encouraged, and protected. so far as state legislation could, the possessory rights of individuals upon lands ceded or granted to the state by the general

government, and all other public, unappropriated, and unsurveyed lands. It will be noticed that in all the acts found in the statutes of this state with reference to such lands, or the sale thereof, great care has been manifested by inserting provisions so as to guard and protect the possessory rights acquired either prior or subsequent to the survey or sale of the land. This court is not called upon to answer all of the various objections urged by plaintiff's counsel, as to whether all the various deeds and other documents by which the title of the Great Salt Basin Gold & Silver Mining Company and of the Silver Peak & Red Mountain Gold & Silver Mining Company passed to the defendant. The question, and the only question, that need be discussed upon this branch of the case, is whether or not at the time Morrison made his application to purchase the 40-acre tract the land was in the actual, adverse possession of another. It is argued that the Great Basin Company did not regularly locate the land. It is enough to say upon this point that it followed and complied with the provisions of the statute. Next, it is contended that the field notes of the surveyor were not recorded within the time mentioned in the act. True; but is this a matter of which plaintiff can complain? Certainly not. He does not pretend to have acquired any rights prior to the recording of the field notes. The incipiency of plaintiff's rights, if any he ever obtained, did not arise until over 21 years had elapsed after the field notes were duly recorded. It is manifest that this objection is totally without merit. In Johnson v. Towsley, 13 Wall. 72, 90, it was claimed that the pre-emption claim of Towsley was governed by the fifth section of the act of 1843, and that, inasmuch as he did not file his declaration of intention within three months from the time of the settlement, his claim was forfeited. The court, in answer to this, said:

"If no other party has made a settlement, or has given notice of such intention, then no one has been injured by the delay beyond three months; and if at any time after the three months, while the party is still in possession, he makes his declaration, and this is done before any one else has initiated a right of pre-emption by settlement or declaration, we can see no purpose in forbidding him to make his declaration, or in making it void when made. And we think that congress intended to provide for the protection of the first settler by giving him three months to make his declaration, and for all other settlers by saying, 'If this is not done within three months, any one else who has settled on it within that time, or at any time before the first settler makes his declaration, shall have the better right.' As Towsley's settlement and possession were continuous, and as his declaration was made before Johnson or any one else asserted claim to the land or made a settlement, we think his right was not barred by that section."

See Piper v. Wyoming, 15 Land Dec. Dep. Int. 93, 97; Mining Co. v. Barclay, 82 Fed. 554, and authorities there cited; Taylor v. Brown, 5 Cranch, 234, 243.

It is argued that the testimony fails to show that defendant was in the adverse possession of the land at the time of Morrison's application. The contention of the plaintiff is that the defendant abandoned the possessory rights of its grantors, if any they ever had, by its failure to keep possession and control of it, and that in any event it has not retained possession of any portion of the land save and except those portions upon which the buildings and improvements were

erected. If the 160 acres had been taken up as agricultural land, the argument of plaintiff's counsel would have much weight. It may be admitted that there was no such location or inclosure of it as would be required to establish a possessory right to 160 acres of agricultural land. The land, however, is not agricultural. It is not claimed by the defendant as such. A portion of the land, including a part of the 40-acre tract claimed by plaintiff, is saline land. It is true that there was no specific location or designation of the land as saline, except such as is to be inferred from the steps that were taken—by having it surveyed, and the field notes thereof recorded—as required by the act of the legislature with reference to saline lands. The law does not require such land to be fenced, in order to subject it to the dominion and control of the claimant. The evidence of acts sufficient to constitute possession of land must always, in a great measure, depend upon the character of the land, its locality, and the object and purpose for which it was taken up and claimed. The law does not require vain and useless things to be done. It only requires such acts to be performed as are necessary to subject the land to the will and control of the claimant, sufficient to notify the public that the land is claimed and occupied, and is in the possession of the claimant. Silver Peak Mines v. Valcalda, 79 Fed. 886, 888, and authorities there cited. In Rogers v. Cooney, 7 Nev. 213, 218, the court, in discussing the question as to what acts were necessary to constitute possession of land upon which tailings from a mine had been deposited, said:

"It is the suggestion of justice and the clearest reason that the same acts which are required to enable a settler to obtain actual possession of pasture or agricultural land should not be demanded where the claim is only of mining ground. In the first case, fencing is often indispensable to completely subject the land to the purposes for which alone it is useful. Hence it is generally held that such acts must be performed as will bring it within this rule of utilization. But fencing a mining claim would be an utterly useless act. It would in no wise improve its value, and would often be a mere incumbrance. It would not in the remotest manner further the purpose for which alone the land is valuable. The rule requiring fencing and improvement is a rule of utility, requiring the land to be subjected to the purposes for which it is useful; but the reason for requiring such improvements in respect to agricultural lands has no application to a mining claim, nor to land like this, which is valuable only for mining purposes. It has therefore been uniformly held that fencing is not necessary; that to do so could serve no purpose except to mark the boundaries, and any other means which will accomplish that object will equally answer the requirements of the law."

Applying to the evidence in this case these general rules, it is, in my opinion, sufficient to establish a possession of the land under the provisions of the law of this state concerning saline lands. The land in question was never abandoned by the defendant, or by any of its grantors or predecessors in interest, after the survey was made. Abandonment is always a question of intention. The various claimants had valuable mines and water rights in the mining district and region of country where the land is situated. They had erected large and expensive improvements of various kinds thereon. The court has the right to assume from the evidence that their early investments and efforts to develop their mining property were not a complete

success.    The property was situated in a mountainous region, far re- moved from transportation facilities, and difficult of access.    They closed down their mills and suspended operations for several years, but they never abandoned the property which they acquired.    They always asserted a title and claim thereto, and always had an agent or watchman in charge thereof.    Under these circumstances, I am of opinion that a fair, just, and liberal construction ought to be given to the provisions of the statutes of this state which express a clear pur- pose to protect the settlement, buildings, and improvements of all parties in their possessory rights; and, when such construction is given, it follows that the acts performed by the defendant brought it within the protection of the statute.    The possession of the defend- ant having been acquired, kept up, and maintained in good faith, with full knowledge of the facts upon the part of the plaintiff, it can- not be devested of such rights because it did not avail itself of the privileges granted by the statute to apply to the state, after the land was surveyed, and make the claim of a preferred right to purchase the same.    Nickals v. Winn, 17 Nev. 189, 195, 30 Pac. 435, and authorities there cited; Stewart v. Doll, 18 Land Dec. Dep. Int. 309; Chapman v. Toy Long, 4 Sawy. 28, 35, Fed. Cas. No. 2, 10.

Upon all the facts established by competent evidence in this case, it cannot, under the repeated decisions of both national and state courts, be successfully maintained that the land in controversy in this case was "unappropriated, public land" at the time of its selection by the state, or at the date when it was listed to the state, or that it was not "in the actual, adverse possession of another" at the time Morri- son made his application to the state to purchase the 40-acre tract. In addition to the authorities hereinbefore referred to, see U. S. v. Williams, 12 Sawy. 138, 30 Fed. 309; Id., 138 U. S. 514, 11 Sup. Ct. 457, and authorities there cited.    Judgment is ordered to be entered herein, in accordance herewith, in favor of the defendant, for its costs.